**In re CONTINENTAL ILLINOIS SECURITIES LITIGATION.**

**No. 82 C 4712.**

United States District Court, N.D. Illinois, E.D.

Sept. 20, 1990.

Michael B. Hyman, Much Shelist Freed Denenberg Ament & Eiger, P.C., Lawrence Walner, Lawrence Walner & Associates, Chicago, Ill., Nicholas Chimicles, Greenfield & Chimicles, Haverford, Pa., Barry S. Rosen, Sachnoff & Weaver, Ltd., Chicago, Ill., Daniel W. Krasner, Wolf Haldenstein Adler Freeman & Herz, Edward A. Grossman, Bernstein Litowitz Berger & Grossman, New York City, for petitioner.

## MEMORANDUM OPINION

GRADY, District Judge.

This case is concluded, and counsel for the plaintiff class have submitted their final petitions for fees. They have previously received $3.13 million in interim payments. They now request an additional $5.87 million in fees and $1.15 million in interest. This opinion will consider those requests.[1]

---

1. Separate petitions of other counsel who served as co-counsel for the class in the early stages of the case are also considered at pp. 896–900, *infra*.

## I

## FACTUAL BACKGROUND

This class action arises out of the relationship between Continental Illinois National Bank & Trust Company of Chicago and Penn Square Bank of Oklahoma City. Penn Square made billions of dollars in loans to gas and oil enterprises in Texas and Oklahoma during the 1970s through the middle of 1982. Penn Square sold over $1 billion of these loans to Continental. In these "loan participation" transactions, the money disbursed to the borrowers by Penn Square was actually provided by Continental; Penn Square's role was to obtain the borrowers, process the loans and oversee collection.

The Penn Square loan portfolio consisted largely of energy loans, and, when the world price of oil fell in 1982, many of the borrowers defaulted. On July 6, 1982, federal regulators closed Penn Square for insolvency. The energy portfolio, including the Continental loan participations, was largely uncollectible. Publicity about the Penn Square disaster and its effect on Continental was immediate and widespread.

News articles published in July were filled with tales of the reckless loan policies of Penn Square Bank. Loans had been made without adequate investigation of the borrower's financial responsibility, without appraisal of collateral and often without taking the necessary steps to perfect security interests. Many of the loans were secured by nothing more than unproven oil reserves. Others were secured by drilling rigs, for which no buyers could be found when oil prices collapsed. Deficiencies in the loan procedures at both Penn Square and Continental, already under investigation by the Federal Deposit Insurance Corporation ("FDIC") and the Comptroller of the Currency, became the subject of Congressional hearings shortly after the closing of Penn Square. Officers of Continental testified before the House Committee on Banking, Finance and Urban Affairs in August and September of 1982. The testimony before the Committee indicated that Continental Bank had allowed Penn Square to manage the energy loans with little supervision.

Class action suits by purchasers of the stock of Continental Illinois Corporation (the holding company for Continental Bank) were not long in coming. Bernard I. Mirochnick, a resident of Illinois, purchased shares of Continental Illinois Corporation on July 12, 1982, and filed suit in this court on July 29, 1982, on behalf of himself and all other purchasers of Continental stock during the period February 15, 1981, to July 29, 1982. Mirochnick was represented by the Pennsylvania firm of Greenfield & Chimicles and the Chicago firm of Much Shelist Freed Denenberg Ament & Eiger ("Much Shelist"). The theory of the complaint was that Mirochnick and his fellow class members had been misled into purchasing the stock at prices far in excess of its actual value. Named as defendants were Continental Illinois Corporation, the Continental Bank, various officers of the bank, and the auditing firm of Ernst & Whinney. It was alleged that the bank and its officers concealed or recklessly ignored the poor quality of the bank's loan portfolio and made misleading statements to the public concerning the financial condition of the bank. Ernst & Whinney was charged with having failed to audit the bank in accordance with generally accepted auditing standards and having recklessly certified the false and misleading financial statements of Continental Illinois Corporation. The complaint alleged violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission.

On July 19, 1982, Andrew Goodman, a resident of New York, purchased shares of Continental and, on August 11, 1982, filed a similar class action against the same defendants. He also designated February 15, 1981, to July 29, 1982, as the class period. Goodman was represented by various New York firms and the Chicago firm of Much Shelist.

Fred L. Steinlauf, a resident of Illinois, purchased his shares of Continental Illinois Corporation on June 22, 1982, before the

closing of Penn Square Bank and the publicity about the detrimental impact on Continental. He filed his class action suit on August 4, 1982, joining the same defendants named in the other complaints but adding the directors of Continental Illinois Corporation and Continental Bank as defendants. The class period designated in Steinlauf's complaint was January 2, 1982, to July 29, 1982. Steinlauf was represented by Attorney Lawrence Walner of Chicago.

On July 21, 1982, Howard Bleier, M.D., P.C. Profit Sharing Plan Trust, purchased shares of Continental[2] and, on September 7, 1982, filed suit in this court naming as defendants Continental Illinois Corporation and Ernst & Whinney. Bleier, a New York resident, was represented by the Chicago firms of Cherry & Flynn and Sachnoff Weaver and Rubenstein ("Sachnoff Weaver").

The four cases were consolidated before one judge of this court, who entered several orders relating to the organization of class counsel and general management of the litigation. On October 18, 1982, the original judge recused himself and the consolidated cases were reassigned to me. On November 3, 1982, the separate complaints were superseded by a consolidated complaint in which the plaintiffs Goodman, Mirochnick, Steinlauf and Bleier repeated the class action allegations against all of the defendants previously named by Steinlauf. In addition, Bleier asserted a shareholders derivative action on behalf of Continental Illinois Corporation against Ernst & Whinney and the bank officers and directors whose negligence was allegedly responsible for the losses on the bank's loans. Bleier alleged that the shareholders had made a proper demand upon the directors of Continental Illinois Corporation to file suit against the responsible defendants, but that the directors had refused to do so.

Counsel for the various plaintiffs pressed for certification of a class represented by their clients that would include persons who purchased their shares as late as the end of the proposed class period, July 29, 1982. Counsel refused to concede that there was any material difference between a person who purchased Continental stock before the failure of Penn Square Bank and one who purchased after the failure and in the glare of the publicity concerning the effect on the Continental Bank. I found that the pre-failure purchasers would be seriously prejudiced by association with purchasers who had obviously bought their shares with knowledge of many of the facts of which the pre-failure purchasers had been ignorant. On November 7, 1983, I certified a class of purchasers of Continental stock during the period from September 1, 1981, through July 5, 1982, the day before the Penn Square closing. I certified Fred Steinlauf, the only named plaintiff who had purchased during the class period, as the sole class representative.

It was apparent from the outset of the case that too many lawyers were involved on the plaintiffs' side. Nine law firms had filed appearances and 25 lawyers from those firms had filed individual appearances. There was no telling how many more were logging time behind the scenes. On June 21, 1983, I entered an order outlining the rules that would govern payment for services in the event the class were to make a recovery. *In re Continental Illinois Securities Litigation*, 572 F.Supp. 931 (N.D.Ill.1983). The order emphasized the need for individual responsibility and the avoidance of unnecessary and duplicative work. The order also provided that any fee petition submitted to the court should have a breakdown of work by specific task, to facilitate a determination of how much time was spent on each task and the extent

---

**2.** The purchase dates for the various plaintiffs are taken from an exhibit to the September 14, 1983, memorandum of Robert P. Frutkin, contained in Class Plaintiffs' Counsel [sic] Final Petition for Award of Attorneys' Fees and Reimbursement of Expenses, Copies of Documents for Which Preparation Exceeded 20 Hours, Appendix B, Category No. 12. Only the Steinlauf complaint mentions the date of purchase (June 22, 1982). The complaints of Goodman, Mirochnick and Bleier merely stated that they purchased "during the class period hereafter defined."

to which it benefitted the class. The order concluded by suggesting to counsel that they attempt to agree among themselves as to who would comprise the reduced number to be designated as class counsel.

A partial reduction occurred when two of the bank officer defendants moved to disqualify counsel from simultaneously representing plaintiffs in the class action and in the derivative action. I concluded that these defendants were correct in their argument that a potential conflict of interest existed between the class plaintiffs, who were suing the corporation in their own interest, and the derivative plaintiff, who was suing on behalf of the corporation. The conflict seemed especially likely in the area of settlement negotiations, where the two kinds of plaintiffs might be competing for limited funds (as later proved to be true in regard to liability insurance coverage on the defendant bank officers). On April 2, 1984, I ordered that the class would have to be represented by different counsel than those who represented the derivative plaintiff. Counsel thereafter agreed upon a division of responsibilities.

There were still too many class counsel, however, and it was obvious that there would be no voluntary departures. Lawrence Walner, attorney for Steinlauf, asked leave for Steinlauf to withdraw as a plaintiff in the consolidated complaint, to file an amended complaint on behalf of the class and to add new class counsel. The motion was opposed by all the other plaintiffs' attorneys in the case, who accused Steinlauf and Mr. Walner of attempting to take over the case for their own financial benefit. I summed up my reactions to the situation in a memorandum opinion:

> The accusations which have been made back and forth in this fight over who will represent the class have caused me to have serious doubts as to whether *any* of the contenders should be allowed the privilege. What is really at stake in this unseemly contest is the financial interest of the lawyers, although, of course, the rhetoric is couched in terms of the welfare of the class. Mr. Walner, ... is accused of padding his time by appearing at depositions not "assigned" to him. In addition, counsel for the other class plaintiffs are critical of the quality of Mr. Walner's work, claiming, for instance, that a memorandum he wrote was so inadequate it was not usable. Mr. Walner, for his part, accuses the other attorneys of overstaffing the case, misunderstanding the issues and needlessly involving East Coast counsel whose only interest is fees.

> \* \* \* \* \* \*

> The principal reason I have delayed so long in naming counsel for the class is that I have had misgivings about the attorneys who urged me to certify a class of persons whose interests were in conflict. Those attorneys represented only clients who purchased their stock after July 5, 1982. Clearly, the post-July 5 purchasers had serious legal and practical problems not common to the pre-July 5 purchasers. Whether this misguided effort to certify an incompatible class was motivated by a desire to control the class through the only clients these attorneys had, or was simply the result of a failure to recognize problems an experienced litigator would immediately grasp, is unclear. In either event, however, I came away from the class certification phase of the case with distinct reservations about whether the attorneys for the post-July 5 purchasers would be adequate representatives for a pre-July 5 class.

Memorandum Op. at 1–2 (Nov. 27, 1984). However, it was apparent that the services of more than just one or two lawyers would be required. It seemed sensible to continue with representation by lawyers who had already invested considerable time in the case. I decided, therefore, to appoint Lawrence H. Eiger (one of the original lawyers for Mirochnick and Goodman), James D. Fornari (originally for Goodman), Nicholas E. Chimicles (Mirochnick), and Lawrence Walner (Steinlauf) as co-counsel for the class. I authorized them to utilize the services of attorneys and paralegals from their respective firms when necessary. *Id.* at 3.

The financial condition of Continental became so precarious that the FDIC entered into an "Assistance Agreement" whereby, in return for a substantial investment of funds, the FDIC acquired controlling interest in the bank and essentially took over its affairs. Pursuant to the agreement, Continental assigned to the FDIC its right to pursue the shareholder derivative claims against the bank officers and Ernst & Whinney. The FDIC was thereafter substituted as plaintiff in the derivative action and hired as its counsel the Chicago firm of Sachnoff Weaver, one of the firms that had been representing Bleier in the derivative action.

Extensive settlement negotiations took place between the plaintiffs (the class and the FDIC) and Continental, the bank officer defendants and their insurance carriers. A settlement was reached and given preliminary approval by me in April 1986. In return for dismissal of the securities fraud claim of the class plaintiffs, Continental paid $25 million into a settlement fund for the class. The bank officers had attempted to persuade their insurance carriers to settle plaintiffs' claims, but no agreement could be reached with the carriers. The total amount of director and officer insurance ("D & O") was $100 million. The combined claims of the class and the FDIC against the individual defendants greatly exceeded that amount. The individual defendants settled with plaintiffs for the full policy limits and assigned to plaintiffs, in full satisfaction of the settlement, their claims against the D & O carriers for bad faith or negligent refusal to settle within policy limits. Eighty percent of the assignment went to the FDIC and 20 percent to the class. I gave final approval to these settlements on July 25, 1986.

Some of the D & O carriers then a filed declaratory judgment suit against Continental and the bank officers and directors, seeking to avoid liability on their policies. They claimed that the reckless conduct alleged by the class was not within the coverage of their policies and that the settlements with the class and the FDIC were collusive. That case was assigned to Judge Milton I. Shadur of this court. Steinlauf, as class representative, attempted to intervene as a defendant on the ground that the interests of the class would not be adequately represented by the FDIC and the individual defendants. Judge Shadur denied leave to intervene, holding that the FDIC and the officer and director defendants "have the incentive and the obligation to make all the relevant legal arguments that Steinlauf would make if he were a defendant. His interest in establishing insurance coverage for the class claims will be adequately represented." *Nat. U. Fire Ins. Co. v. Continental Illinois Corp.*, 113 F.R.D. 532, 538 (N.D.Ill. 1986).

The claims against the D & O carriers were settled at various times during 1987 and 1988, with the class plaintiffs receiving a total of $13 million on their $20 million assignment. The class has therefore received a total of $38 million in settlement payments, and that amount earned another $7 million in interest by the end of 1989.

The remaining defendant was Ernst & Whinney. The parties were unable to settle, and I presided over an 18-week jury trial in 1987. The class endeavored to persuade the jury that Ernst & Whinney had been reckless in its audits and its certifications of Continental financial statements, resulting in an artificial inflation of the purchase prices of Continental stock during the class period. The FDIC contended that Ernst & Whinney had been negligent in its audits of Continental and in failing to advise Continental's officers and directors of the dangers lurking in the energy loan portfolio. The jury returned verdicts in favor of Ernst & Whinney on both claims. No appeal was taken.

II

FEE PETITION OF CLASS COUNSEL

The court's basis for awarding fees in this case is the familiar "common fund" theory. The services of counsel have contributed to the creation of the settlement fund which will be distributed to the class, and it is equitable that counsel be compensated from the fund for those services.

The problem is how to value those services. From the outset of this case, the court and counsel have proceeded on the premise that the *Lindy* "lodestar" method would be used. No other method was suggested by counsel, nor did the case law at the time suggest that an alternative would be permissible. Under the lodestar method, the first step is to determine "the amount to which attorneys would be entitled on the basis of an hourly rate of compensation applied to the hours worked." *Lindy Bros. Bldrs., Inc. of Phila. v. American R. & S. San. Corp.*, 487 F.2d 161, 167 (3rd Cir.1973). The premise of this approach is that "[t]he value of an attorney's time generally is reflected in his normal billing rate." *Id.*

Petitioners have grouped their services into 284 categories. Category No. 1, for instance, is "Pre–Complaint Investigation." Category No. 2 is "Preparation of Complaint." Each category is documented by chronological time entries indicating services performed in that category by each attorney and paralegal over the life of the case. These time sheets are in a 23-volume appendix entitled "Statement of Services." Appendix I contains categories No. 1 through No. 16; Appendix II contains No. 17 through No. 26; and so on.

The Statement of Services has also been separated into three stages. Stage One covers the period through May 31, 1986, when the first interim fee award was made. Stage Two covers June 1986 through July 1988, when the second interim fee award was made. Stage Three covers services rendered subsequent to July 31, 1988. These interim payments were 50 percent of the hourly charges claimed by counsel for each stage. I made no determination as to whether the full amounts claimed were justified and expressly reserved that question until the conclusion of the case.

█ Petitioners argue they should be paid for their work on the Ernst & Whin-

ney claim, even though the trial resulted in a loss. They urge that what they learned in the Ernst & Whinney trial was useful in their pursuit of the D & O carriers and was instrumental in bringing about the D & O settlements. The argument is strained,[3] but, more than that, it is unnecessary. There is no question that petitioners should be paid for their work on the Ernst & Whinney claim. The class was advised that the case against Ernst & Whinney would be pursued following the settlement with the bank and the individual defendants, and no class member objected. Had the claim been successful, the class would have recovered an amount from Ernst & Whinney perhaps in excess of that obtained in the settlements with the other defendants. (I do not recall what amount class counsel requested of the jury in final argument, but at the time of the settlement with Continental and the individual defendants in July 1982, counsel estimated that the class damages were between $101 million and $116 million. Statement in Support of the Estimate of Class Damages at 1.) The claim against Ernst & Whinney was a plausible one, and it was clearly worth pursuing. Although the class did not recover, it had the benefit of a full scale effort. It would be unjust to deny class counsel reasonable compensation for making that effort.

In the final petition, counsel claim compensation for 23,930 hours of attorney and paralegal time in Stage One, 17,450 hours in Stage Two, and 575 hours for Stage Three. They ask for compensation based on their "lodestars" (hours × billing rates) and, in addition, for "multipliers" of the lodestars for all Stage One work and for the D & O work in Stages Two and Three.

It will be useful to analyze the petition in terms of the number of hours, the hourly rates, and finally, the question of multipliers.

---

**3.** Contrary to petitioners' argument, the theories of the two cases were largely inconsistent. The more the bank and its officers knew about the Penn Square situation, the less need there was for Ernst & Whinney to tell them about it. Perhaps the principal obstacle the class had at the trial was the uncontradicted evidence that the highest officers of the bank were well aware of the types of loans Penn Square was making and the nature of the collateral that was being pledged to secure them.

*A. The Number of Hours*

In the Revised Memorandum of Class Plaintiffs' Counsel in Support of a Final Award of Attorneys' Fees and Reimbursement of Expenses ("Memorandum"), counsel acknowledge the troublesome nature of hourly charges:

> The primary defect of the lodestar approach is its emphasis on the quantity of hours expended as a basis for arriving at a reasonable attorneys' fee. Because of this emphasis on hours worked, the lodestar methodology penalizes efficiency and creates a disincentive to resolve cases at the earliest appropriate opportunity. *See* Third Circuit Report, 108 F.R.D. at 248; *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir.1986) ("An hourly fee creates an incentive to run up hours, to do too much work in relation to the stakes in the case."). (footnote omitted).

Memorandum at 23 (footnote omitted). Petitioners repeatedly invite me to deemphasize the matter of hours and consider the fee request in light of the percentage it represents of the total amount recovered by the class. They point out that the $9 million they are requesting in fees and interest would represent "only" 22 percent of the settlement fund.

■ There are two problems with the percentage approach. First, this is not the basis on which the representation in this case was undertaken. Counsel, the court, and the members of the class have all understood from the outset that compensation in this case would be on an hourly basis. It is too late to change the rules. Secondly, the percentage approach has its own problems. *Lindy* itself was a rejection of what the reviewing court believed was an excessive percentage fee; the case was remanded for a determination of the appropriate fee under the "lodestar" method, which the court thought was "the only reasonably objective basis for valuing an attorney's services." 487 F.2d at 167. There is nothing about 22 percent that strikes me as more reasonable than an amount properly computed on a time basis with appropriate adjustments.

The settling defendants have made their payments into the settlement fund and have no further interest in how the money is disbursed. No member of the class has filed an objection to the fee petition. The situation before the court is well described by the Third Circuit Task Force on Court Awarded Attorney Fees:

> Another difference between fund-in-court and statutory fee cases is that in the former category there is a greater need for the judge to act as a fiduciary for the beneficiaries (who are paying the fee), particularly in the class action situation, because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set. Judicial scrutiny is necessary inasmuch as the fee will be paid out of the fund established by the litigation, in which the defendant no longer has any interest, and the plaintiff's attorney's financial interests conflict with those of the fund beneficiaries. As a result, there is no adversary process that can be relied upon in the setting of a reasonable fee.

*Court Awarded Attorney Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237, 251 (1985) (footnote omitted).

I have examined each of the hundreds of pages of time entries submitted in support of the 41,955 hours of attorney and paralegal time claimed in the petition. I have also examined the 16–volume set of appendices containing copies of every pleading or memorandum on which more than 20 hours time was spent. It may be that only an exercise of this kind can convince one of the futility of attempting to decide what amount of time was necessarily spent on a case of this breadth and duration. I attempted to regulate the timekeeping in this case in a manner that would permit measurement of the time spent on each task and a determination of whether that amount of time was necessary and productive. *In re Continental Illinois Securities Litigation,* 572 F.Supp. 931 (N.D.Ill. 1983). Petitioners' Statement of Services, unfortunately, does not accomplish what I had in mind. Instead of listing discrete tasks and the time spent on each, the time entries are grouped in "categories." Some

of the categories are manageable, since they collect all work related to a particular task and are confined to that work. Each of the 140 depositions, for instance, is a separate category. Other categories defy analysis. For instance, Category No. 218, "Designation and Preparation of Exhibits" for the Ernst & Whinney trial, consists of 37 pages of chronological entries such as:

| Name | Date | Activity Description | Hours |
|------|------|---------------------|-------|
| MBH | 10/19/85 | Telephone call with B. Rosen re: coordination of trial exhibits and witness designations. | 5.40 |
| | | * * * * * | |
| DLS | 11/06/85 | Documents for trial exhibit list; conference with Chimicles re: same | 4.00 |
| | | * * * * * | |
| S–K | 11/14/85 | Identify reg. gen. documents for trial use. | 4.30 |

The total attorney time claimed for this category (not including paralegal time) is 582 hours and the requested fees for the time are $83,500.00. The examples just quoted are typical of most entries in the Statement of Services. It is impossible to tell, except in the most general way, what was done. In Category No. 218, all one can tell is that the persons involved spent time organizing documents for the trial. There is no indication, and no way of telling, how much of the time was spent on documents that were actually used in the trial. There is no way to determine whether the time claimed is more than necessary to accomplish what was done, and no way of identifying what benefit the class derived from the activity referred to in any of the entries.

Would it help if the entries concerning the organizing and reviewing of documents were more detailed? Perhaps a little. But there is only so much that can be described. Assuming it would be possible to describe everything that was done in 4½ hours of organizing documents, it is doubtful that the effort itself would be cost-efficient. And even such a lengthy recitation would leave unanswered the questions of whether the work should have taken 4½ hours and whether anything useful was accomplished. In fairness, then, it is not always clear that a detailed time entry would give the reader much more *useful* information than do entries like those quoted above or the following from Category No. 219, Strategy and Planning Conference Regarding Trial:

| Name | Date | Activity Description | Hours |
|------|------|---------------------|-------|
| FLF | 10/21/86 | Research/briefs. | 3.00 |

Whether the description of the work is general or specific, acceptance of the proposition that the time spent was no more than necessary, and that it produced some-

thing useful for the client, is often an act of faith.[4] This is no less true when the person attempting the determination is not the client but the judge who presided over the case. Most of the activity for which compensation is claimed—drafting, reviewing, conferring, researching, corresponding, traveling—is time spent out of court. Little of it has even an indirect product that can be seen and evaluated by the judge.

The reviewing courts have recognized the difficulty of deciding what particular aliquots of time are excessive or unproductive. Percentage reductions have been approved, even recommended, as the preferable method of eliminating excessive time:

> The district court acted within its discretion when it chose to cut the number of hours by a lump sum in response to appellees' claim that the time was inflated. We endorse the court's approach as a practical means of trimming fat from a fee application; it is generally unrealistic to expect a trial court to evaluate and rule on every entry in an application. Cf. New York State Association for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir.1983) (percentage reduction of hours appropriate in cases with voluminous fee applications), and the cases there cited.

Tomazzoli v. Sheedy, 804 F.2d 93, 98 (7th Cir.1986). See also Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc., 776 F.2d 646, 656–658 (7th Cir.1985) (15 percent reduction in hours approved); Northcross v. Bd. of Education of Memphis City Schools, 611 F.2d 624, 636–637 (6th Cir.1979).

■ Applied strictly, the rule that a court "may eliminate hours that are not documented in sufficient detail," Tomazzoli, 804 F.2d at 98 n. 5, would result in elimination of most of the time claimed in this case. In deciding not to make reductions of that size, I have taken into consideration that petitioners have the burden of proving something which is difficult to prove—i.e., that they necessarily spent a particular number of hours on a particular task. In an effort to be as fair as possible to the petitioning attorneys, I will disallow hours only where I am convinced the time is excessive or that the time did not significantly benefit the class. I will resolve moderate doubts in favor of petitioners, which means that an enormous amount of time evidenced only by vague entries will be approved. Most categories will survive intact as far as the number of hours is concerned, and I will discuss only those categories where I order a reduction. The reductions are in time spent on work I warned counsel would be subject to particular scrutiny: excessive time spent on legal research; too much time spent on "reviewing" the work of others; and too much time spent by counsel "conferring" with each other. In re Continental Illinois Securities Litigation, 572 F.Supp. at 933, 934–935. I have not disturbed the paralegal and law clerk time but have concentrated on the attorney time, which I find more susceptible of analysis.[5]

The courts that have made percentage reductions in fee petitions have not tried to explain why they have chosen one percentage rather than another. If precise explanations were possible, resort to percentages would be unnecessary; specific time could be identified as excessive. The selection of a percentage is a judgment call, based on the judge's general experience and knowledge of the issues in the particular case, as to how much of the claimed time is in excess of what was required for the useful portion of the work. The determination is necessarily impressionistic and, to a degree, arbitrary. In this, however, it is not unlike other decisions our system of justice calls upon factfinders to make, as, for instance, the selection of a particular dollar figure—rather than another—to compensate for disfigurement, pain and suffering or injury to reputation.

4. The more basic question that arises in many cases is whether the time is accurate. Exaggeration of the actual time spent is all too common in fee petitions. In this case, I have seen no evidence that time was not accurately recorded.

I take the claim at face value, therefore, and assume that the time was actually spent.

5. See discussion at p. 891, infra.

Each category in the Statement of Services contains a summary of the number of hours and requested hourly rates for each attorney, law clerk and paralegal. The summaries do not, however, show the grand totals of either the hours or the dollar figures claimed for each category. The following discussion of excessive time, therefore, uses rounded figures:

No. 2 Preparation of Complaint

 This category must be considered in light of Category No. 1, Pre–Complaint Investigation, for which 93 attorney hours, totalling $25,000.00, are claimed. Category No. 2 seeks an additional $30,000.00 for 114 attorney hours. Time is claimed for the preparation of the Goodman, Mirochnick and Steinlauf complaints, although, as noted above, only Steinlauf was an appropriate class representative. I will allow the 21 hours claimed by Lawrence Walner & Associates in Category No. 2, since Mr. Walner was the attorney for Steinlauf. The attorney time for the other two firms will be reduced by 35 percent. The only practical way to accomplish this is to reduce the time of *each* attorney by that percentage, since it is not possible to differentiate among them in terms of duplicative time. (This same method will apply to all categories where time is reduced.)

No. 3 Preparation of Consolidated Complaint

 The claim here is for 107 attorney hours, valued by petitioners at $32,000.00. The consolidated complaint was a refinement of the Steinlauf complaint, with the addition of Bleier's shareholder derivative action. In their Memorandum, petitioners say they are not claiming any time for the derivative action, but considerable time in relation to that action is in fact claimed in Category No. 3. *See, e.g.,* entries of August 9, 31, 1982, September 8, 10, 14, 16, 17, 1982. Another problem is that the firm

of Sachnoff Weaver, which was co-counsel for all plaintiffs on the consolidated complaint, has filed a separate petition for fees earned during the time it was co-counsel for the class. This firm alleges that it "took on primary responsibility for drafting a consolidated complaint," and seeks $11,000.00 for the 62 hours it devoted to that work. If I were to grant the claims of all attorneys for the drafting of the consolidated complaint, that document would cost $43,000.00.

The attorney time for Category No. 3 will be reduced by 50 percent.

No. 4 Pretrial Orders, Order for Preservation of Documents and Protective Orders

 A total of 165 attorney hours and $38,000.00 is claimed for this category. The time entries are mostly for drafting and for lawyers conferring with each other. It is impossible to make even a rough guess as to how much of the time in this category or any other in the petition was spent in conferences among counsel, since it is rare that a time entry will refer only to a conference; usually, the conference is listed along with several other items, with no allocation of the time. In setting the ground rules, I attempted to discourage unnecessary conferences:

> Generally, attorneys should work independently, without the incessant "conferring" that so often forms a major part of the fee petition in all but the tiniest cases. Counsel who are not able to work independently should not seek to represent the class.

*In re Continental Illinois Securities Litigation,* 572 F.Supp. at 933. If this admonition had any effect at all, it is imperceptible. I have little doubt that "conferring" is the activity which consumed more time than any other in the case. How much of it was necessary and productive is obviously impossible to gauge.[6]

---

6. I attempted to require timekeeping in a way that would allow some evaluation of conference time:

> Much of the narrative in most fee petitions consists of entries like "conference with GBS re motion to compel." As indicated above, such "conferences" should be held only when

necessary, which should not be very often. But in no event would that kind of entry be sufficient to show the conference was necessary and productive. There should be a statement, albeit very brief, of specifically what was discussed and what conclusion was reached. Should such a statement necessarily

The pretrial orders that were the subject of this category of work were mostly of the kind that are entered routinely in complex federal litigation and are included as forms in the *Manual for Complex Litigation.* One of them, pertaining to the "organization of plaintiff's counsel," was the one I vacated for the good of the class.

A specific example of excessive time in this category is the trip that *both* Mr. Greenfield and Mr. Chimicles took from Philadelphia to Chicago on September 8, 1982, to attend a meeting with other counsel. Each of them has charged 16 hours for the trip and the conference. (I have seen no instance in this petition where travel time is not billed at the full hourly rate; every moment in transit was apparently spent working on the case.) Multiplying these 32 hours by the requested hourly rates for Messrs. Greenfield and Chimicles, the class is being asked to pay $9,440.00 for their attendance at the meeting. The petition contains not the slightest hint of what was accomplished at the meeting.

The attorney time in Category No. 4 will be reduced by 75 percent.

No. 5 Class Action Related Discovery

■ Petitioners claim 85 attorney hours at $21,000.00 for this category, which consisted largely of defending against the defendants' efforts to undercut the *bona fides* of Mirochnick, Goodman and Bleier as class representatives. There was a sound basis for defendants' position, inasmuch as these plaintiffs had purchased their shares after the calamity at Continental had been well publicized. None of them was certified as a class representative, and the efforts to have them certified were not beneficial to the class.

The attorney time for this category will be reduced by 75 percent.

No. 7 Notice—No. 1 (1985)

■ The claim here is for 62 hours of attorney time at $12,500.00. The work was preparation and mailing of a relatively simple notice to the class describing the pleadings and the status of the case.

The attorney time is reduced by 50 percent.

No. 12 Class Certification—General

■ The time entries here are laden with conferences, meetings and phone calls among counsel. Much of the activity was devoted to the attempt to certify Mirochnick, Goodman and Bleier as class representatives, which, had it succeeded, would have been detrimental to the class. The claim is for 150 hours at $35,000.00.

Mr. Walner's time will be reduced by 25 percent, and the time of the other attorneys will be reduced by 75 percent.

No. 14 Research on Class Certification

■ This category also appears largely devoted to the ill-starred attempt to certify inappropriate class representatives. (Mr. Walner has no time in this category.) Thirty-two hours are claimed, for $9,500.00.

The time will be reduced by 75 percent.

No. 17 Defendants' Motions to Dismiss and Related Matters

■ This category pertains to the work in opposition to motions of the various defendants to dismiss the consolidated complaint. The defendants all raised essentially the same arguments, and plaintiffs responded with one brief. It was a good brief, but the issues of law were not novel. My rulings on the motions simply applied settled principles of law to the allegations of this complaint. Petitioners claim 690 hours, for $170,000.00. Sachnoff Weaver, in its separate petition, claims another 47 hours at $9,500.00.

Petitioners' time entries contain numerous references to the *Zapata* memorandum, which pertained solely to the derivative action. Conferences abound. Hundreds of hours of research are claimed, mostly without identifying the question or the results. In appointing petitioners to

include privileged information (which seems unlikely, since it will be submitted at the end of the case), it may be submitted *in camera.* 572 F.Supp. at 934–35. The idea seemed worth a try, but it had no test in this case because my request was totally ignored. Not a single conference entry is supported by any indication of its result.

represent the class, I assumed, correctly, that they had had considerable experience in securities litigation.[7]

> Counsel who are sufficiently experienced to represent the class are presumed to have an adequate background in the law applicable to the case. While it is recognized that particular questions requiring research will arise from time to time, no fees will be allowed for general research on law which is well known to practitioners in the areas of law involved.

*In re Continental Illinois Securities Litigation,* 572 F.Supp. at 933.

The attorney time in this category will be reduced by 40 percent.

**No. 18 Motion to Dismiss Harper**

■ One of the individual defendants was James D. Harper, Continental Bank's vice president in charge of the real estate department. The complaint charged him, as it did the other individual defendants, with reckless conduct in regard to the bank's loan portfolio and with having failed to disclose material facts concerning the bank's financial condition to purchasers of Continental stock. Plaintiffs were unable to produce any evidence that Harper had any responsibility outside the real estate department, that he was aware of loan problems in the other departments or that he had any duty of disclosure regarding such matters. On those grounds, I granted summary judgment for Harper on all counts of the complaint other than those pertaining to real estate loans. Order of October 12, 1984. I gave plaintiffs leave to amend the complaint to allege specifically what real estate loans had played a significant part in Continental's financial collapse and the consequent damage to plaintiffs and to allege specifically what conduct on Harper's part made him liable to plaintiffs in regard to those matters. Almost all of the 75 hours for which petitioners request compensation were spent after the date of that order. (Apparently the major share of the work done in regard to Harper prior to the partial summary judgment was done by

counsel other than petitioners, and no compensation is sought for that work.) The work in this category was a motion for reconsideration, which was denied, and discovery in an effort to develop liability based on Harper's real estate activities. After several months, plaintiffs moved to dismiss the remaining counts against Harper with prejudice, acknowledging that they had no evidence to offer. To avoid the expense of notice to the class, I entered summary judgment instead of dismissing. Order of February 15, 1985.

The question on Category No. 18, then, is whether counsel can be compensated from the common fund for work that was of no benefit whatever to the class. This was not a matter of losing on a question of fact. There was no question of fact. No evidence of Harper's liability existed. The motion for reconsideration was throwing good time after bad. The additional time spent trying to uncover something in regard to the real estate loans was wasted; the prospect of finding something new, in light of the extensive discovery that had already taken place, was virtually nil.

The time in this category is reduced by 75 percent.

**No. 19 Dismissal of Outside Directors**

■ The Statement of Services for this category does not disclose the nature of the work performed and how the class was benefited by it. The time entries consist of conferences and the drafting of a stipulation to dismiss Continental's outside directors, without prejudice. I asked counsel for additional information, which was furnished in a letter of August 13, 1990. I am still puzzled as to the benefit the class obtained from the 19 hours spent in this category, for which $5,500.00 is claimed. The idea of joining the outside directors as defendants was a bad one to begin with; there was no evidence of their liability to the class.

The time in this category is disallowed.

7. Each of the Goodman, Mirochnick, Bleier and Steinlauf complaints contained the identical allegation that the plaintiff "has retained competent counsel experienced in litigation of this nature."

No. 20 Motions and Memoranda Unrelated to Discovery

 This category consists of 250 hours, for which $52,000.00 in compensation is claimed. Much of the time was spent by counsel in conferences and in "reviewing" each other's memoranda. Some of the work relates to defendant Harper, *e.g.*, Statement of Services, Appendix II, No. 20 at 14–18, which, for the reasons explained in Category No. 18, was of no benefit to the class.

The attorney time in this category is reduced by 40 percent.

No. 21 Research Re: Class—Derivative Conflict of Interest

 This category involved 92 hours of attorney time, for which $18,000.00 is requested from the fund. The work consisted of researching and briefing the question of whether there was a conflict of interest between the class and the derivative plaintiff which prevented the same attorneys from representing both sets of plaintiffs. I rejected counsels' argument that there was not even a potential conflict and ruled that attorneys who represented the class could not also represent the derivative plaintiff. The class derived no benefit from the time that counsel spent in the unsuccessful effort to persuade me that no potential conflict existed. This was counsel's problem, and the time they chose to spend on it was in what they perceived to be their own interest.

The time in this category is disallowed.

No. 22 Buchbinder Motions and Memoranda

 The 38 hours in this category, for which counsel seek $10,000.00, consist largely of conferences and "reviewing" each other's work.

The time is excessive and will be reduced by 50 percent.

No. 44 Plaintiffs' Request to Admit

 Counsel prepared requests for admissions relating to the specifics of a large number of loans. The requests obviously required a great deal of time to prepare. However, a major portion of the 1,000 hours ($169,000.00) claimed for this category was spent in conferences among counsel. There was simply too much of it, and the time in this category is reduced by 30 percent.

No. 45 Defendants' Request to Admit

 Forty-four hours are claimed in this category, at a value of $10,000.00. This is clearly an excessive amount of time to have spent on the answers that were filed by plaintiffs, which admitted very little and simply objected to many of the requests.

The hours will be reduced by 50 percent.

No. 170 Discovery Disputes With Continental

 This category comprises over 620 hours of attorney and paralegal time, set forth in 69 pages of entries in the Statement of Services. The principal component of attorney time is meetings and conferences with each other.

The attorney time in this category will be reduced by 25 percent.

No. 175 Motion to Compel Production of Documents Relating to SLC

 The 165 hours ($38,000.00) claimed in this category are in relation to the effort of the class to obtain access to materials compiled by the Special Litigation Committee of Continental Illinois Corporation while that Committee was considering whether to recommend to the corporation that an action be filed against the bank's officers and directors and Ernst & Whinney. An additional 162 hours for work on this same subject matter is claimed separately by the firm of Sachnoff Weaver. *See* discussion at pp. 898–899, *infra.* There was duplication of effort by the two firms, and the hours in this category are reduced by 30 percent.

Nos. 205, 206 and 207

 These categories are explicitly devoted to conferences. No. 205 is "Planning Conferences & Correspondence Between Class Counsel and FDIC" (102 hours, $26,-500.00). No. 206 is "Coordination and Correspondence Conferences With Plaintiffs' Counsel" (457 hours, $82,000.00). No. 207

is "Plaintiffs' Conferences and Correspondence Regarding Evaluation of Litigation" (260 hours, $61,000.00).

In light of the fact that these categories are in addition to the conferences which dominate so many other categories, another 819 hours is too much.

The time in each of Categories 205, 206 and 207 is reduced by 35 percent.

No. 218 Trial: Designation and Preparation of Exhibits

■■■ This category concerned preparation of exhibits for use in the Ernst & Whinney trial. A total of 582 hours of attorney time is claimed, at a value of $83,500.00. Numerous other categories of work relate to these same documents. An additional 582 hours is excessive.

The attorney time in this category will be reduced by 35 percent.

No. 219 Strategy and Planning Conferences Regarding Trial

■■■ The conferences in this category occupied 721 attorney hours, at a requested $153,000.00. The attorney time is reduced by 50 percent. This reduction seems especially appropriate in view of the fact that I am making no reductions in the time claimed for Categories 232 through 254, the work on the Ernst & Whinney trial described in weekly segments. The requested fees for the attorney time in those categories, which includes a considerable amount of conferring, total $1,155,800.00.

## B. The Hourly Rates

### Attorney Rates

■■■ Petitioners argue that they should be paid at their current hourly rates in order to compensate for delay in payment. They have requested that their 1988 hourly rates be applied to all hours for which they have not yet received compensation.

■■■ I agree that payment in current rates is appropriate to compensate for delay. The question is what that rate should be. Petitioners argue that each attorney who worked on this case should be compensated uniformly at a single rate regardless of the type of work involved. Petitioners

explain that each attorney customarily charges just one rate for all work in litigation, regardless of the kind of work, since "each stage of the litigation has its own complexities and requires as much legal ability, care and breadth of experience as the next stage." Memorandum at 29–30. On this basis, petitioners ask that I apply rates of up to $315.00 an hour. (The attorneys with the most hours would be Lawrence H. Eiger at $260.00, Nicholas E. Chimicles at $275.00, and Lawrence Walner at $265.00).

I disagree with the proposition that the same rate should apply to all work. The argument that no more talent or experience is required for one aspect of a case than another is absurd. The very making of the argument is a reflection on counsels' sophistication. Much of the work that was done in this case, including all of the extensive factual and legal research, could have been done by relatively inexperienced lawyers, and some of it was. To say that no different or additional ability is required to try a jury case effectively is contrary to experience. It is appropriate in fixing hourly rates to distinguish between trial time and office time, *Whitley v. Seibel*, 676 F.2d 245, 253–254 (7th Cir.), *cert. denied*, 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982), and between work that could be performed by junior attorneys and that which requires more experience, *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 591–93 (3rd Cir.1984) (affirming reductions of partner rates to associate rates for activities that should have been performed by associates). *See also Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir.1974) (appropriate to distinguish between "legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers ..."); *Sanchez v. Schwartz*, 688 F.2d 503, 506 (7th Cir.1982) (different rates appropriate for court time and office time).

■■■ Petitioners' argument for a single rate for each lawyer would be more palatable if what they sought were blended rates, taking account of the different de-

mands of the different kinds of work each lawyer did. But that is not what petitioners seek. What they want is to apply their highest possible rates for all work they did, regardless of what it was. This would result in significant overcompensation in this case, considering the amount of work that could not reasonably command top rates.

The overcompensation that would result from awarding top rates for all activity in this case would magnify an overcompensation factor that is inherent in the major premise of the lodestar theory—that a unit of time equals a unit of value. The fact is that some time—much of the time that lawyers spend talking to each other, for example—yields little or nothing of value to the client. The only way to determine the actual value of a unit of time is to see what came of it. But as indicated above, it is impossible to tell from most of the time entries in this petition just what was done ("conference," "research," and "review" reveal almost nothing), let alone what was accomplished. The memorandum in support of the petition is replete with self-laudatory references to counsels' work, but short on explanation as to why the work had to be done by lawyers who believe their skill and experience warrant rates of $260.00 and $275.00 per hour for everything they do. Petitioners do argue that "[t]he novel concept of an Insurance Assignment was developed, in part, by Class Counsel and adopted by the parties to deal with recalcitrant directors' and officers' insurance carriers ("D & O Insurers")." Memorandum at 6. But there was nothing novel about an insured assigning to a claimant, in settlement of the claim, his cause of action against his insurer for negligent or bad faith refusal to settle the claim within policy limits. The Illinois case most often cited for the basic duty of the insurer is *Olympia Fields Country Club v. Bankers Indem. Ins. Co.*, 325 Ill.App. 649, 60 N.E.2d 896 (1st Dist.1945). The "Olympia Fields doctrine" has been well known among Illinois lawyers for decades. The right of the insured to assign the claim

against the insurer to the judgment creditor, as occurred here, was recognized in Illinois at least as early as *Brown v. State Farm Mut. Auto. Ins. Ass'n*, 1 Ill.App.3d 47, 272 N.E.2d 261 (4th Dist.1971), which noted that the courts of Pennsylvania, Oregon, California and Kentucky had held the action to be assignable. By 1973, the fact that the plaintiff in such a case was the assignee of the insured was not even a subject of comment by the court. *Smiley v. Manchester, Ins. & Indem. Co. of St. Louis*, 13 Ill.App.3d 809, 301 N.E.2d 19 (2nd Dist.1973). It is true that such cases usually arise in the personal injury context, but the principles of law are no different when the risk insured against is officers' and directors' liability.

Another problem with petitioners' claim to special credit for the D & O work is that they were barred from participating in the D & O litigation by Judge Shadur's denial of their petition to intervene.[8] The attorneys for the FDIC and the bank officers and directors clearly had the laboring oar on the D & O part of the case.

This was not a case in which experts used their previously acquired knowledge to accomplish results in a minimum time. If we had that kind of situation here, it would be appropriate to reflect it in the hourly rate:

> There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rate.

*Blum v. Stenson*, 465 U.S. 886, 898, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984). Apart from that kind of exceptional case, any novelty or complexity of the issues is reflected in the number of hours for which compensation is allowed, *id.*, and I have allowed a number of hours I believe is adequate for what had to be accomplished.

---

8. *See* discussion at p. 876, *supra.*

It was clear from the beginning of the case what had to be proved against each defendant. The proof would consist largely of bank records pertaining to the numerous defaulted loans. These records (or frequently, their absence) would demonstrate reckless conduct on the part of Penn Square, Continental and Continental's officers. The same records, or their absence, would show what Ernst & Whinney recklessly disregarded in certifying Continental's financial statements. Some of the necessary evidence had already been collected by the Comptroller of the Currency and the Congressional Committees.[9] Petitioners also had the benefit of advice from experts on banking, oil and gas loans and auditing. *See, e.g.,* Category No. 189 (512 attorney hours, $129,000.00, for consultations with various experts). With this background, it was not difficult to look through the loan files for evidence of inadequate loan procedures at Penn Square and lack of supervision by Continental. Much of the testimony at the Ernst & Whinney trial concerned the lack of documentation, such as signed promissory notes or evidence of recorded liens, in the Penn Square loan files. There was nothing complicated about determining whether these documents were contained in the files. Considerable time claimed for review of documents in this case was spent by senior attorneys. An example is Category No. 26, "Plaintiffs' Documents Request—Review of Documents Produced by Continental." In their description of the work in this category (Exhibits to Fee Petition, Exh. G at 10), petitioners state

> This review was substantially by junior attorneys and paralegals who did the initial document review, organized the important documents and noted document discovery problems or discrepancies. More senior attorneys' review pertained specifically to examining documents in

preparation for deposition or examining particularly important categories of documents selected by the junior attorneys.

This statement leaves the impression that most of the time in Category No. 26 was spent by junior attorneys and paralegals. However, an examination of the breakdown of attorney and paralegal time in this category reveals the following: Of the 637 hours claimed by Much Shelist attorneys and paralegals, 441 hours are claimed by attorneys whose requested rates are $160.00 per hour and above; 123 hours are for attorneys whose rates are below that level ($125.00 and $130.00 per hour); and 72 hours were spent by paralegals. Of the 352 hours claimed by Greenfield & Chimicles, 184 hours are claimed by attorneys whose requested rates are $175.00 per hour and above; 66 hours are claimed for attorneys whose requested rates are below that level ($90.00 and $115.00 per hour); and 102 hours are claimed for paralegals. Lawrence Walner & Associates did a better job of delegation, which may be due to the fact that Mr. Walner is the only member of the firm whose requested rate exceeds $150.00 hour. Of the 362 hours claimed by Lawrence Walner & Associates for this category, Mr. Walner, whose requested rate is $265.00, spent 140 hours; attorneys whose rates are $150.00 and $120.00 per hour spent 709 hours, and a paralegal spent 11 hours.

There was, of course, more to the case than examining documents. Legal research was done, legal memoranda were prepared, written discovery was conducted and 140 depositions were taken. Again, however, none of this work presented problems of more than ordinary difficulty. The legal research was basic, regrettably so. The legal memoranda addressed no unusually complicated or novel questions of law. Written discovery was voluminous,

---

9. Probably the most incriminating document relied on by plaintiffs in the Ernst & Whinney trial was the "Kenefick memorandum," an internal document at Continental, written by a senior lender, Kathleen Kenefick, in 1981, pointing out the lax policies at Penn Square, the lack of supervision by Continental, and warning that "corrective action should be instigated quickly to stem any future deterioration." This memorandum (quoted at pp. 14 of plaintiffs' memorandum in opposition to defendants' motions to dismiss the class claims, Tab 17 of Appendix B to the petition) was produced at a hearing before the House Committee on Banking, Finance and Urban Affairs in the summer of 1982.

but its objectives were obvious and the methods employed were mostly routine. As far as the depositions are concerned, counsel had a wealth of documentary material and for some witnesses the transcripts of prior testimony before a Congressional Committee to assist them. With the exception of the auditing witnesses, none of the deposition testimony that I am aware of involved particularly complicated subject matter.

■ The quality of representation can also affect the hourly rate. *Blum*, 465 U.S. at 899, 104 S.Ct. at 1549. In this case, with notable and regrettable exceptions such as the effort to obtain certification for an inappropriate class, the quality of representation was acceptable. However, it was not exceptional. The overwhelming majority of the work was routine, so that a discussion of quality is actually somewhat incongruous. (How does one judge the quality of work described only as "conference" or "review of documents?")

■ The only work in this case that in my view could, in the right circumstances, command top rates was the trial of the Ernst & Whinney case. However, counsel's efforts were not successful. In determining the appropriate rate, one must look not only at the kind of work counsel did, but the result of the work. Granting that trial work should ordinarily warrant a higher rate than non-trial work, the cases in which that rule is applied are cases in which counsel have prevailed in the trial. It would be anomalous to award top rates for an unsuccessful trial. (Had Ernst & Whinney been the only defendant in this case, we would have no occasion to consider the question of fees payable from a common fund.)

My conclusion, then, is that none of the work in this case justifies hourly rates which would be appropriate for work of the most demanding kind.

The next question is whether it would be possible to segregate the work into different types for which different rates would be appropriate. While that might be possible in theory, the 41,955 hours listed in petitioners' Statement of Services do not yield to this kind of analysis. First, the "mixed" nature of most of the entries in the Statement of Services does not allocate time between the various types of work, so it would not be possible even to approximate the total time spent on each. Secondly, the description of the work is so general there would be for the most part no rational basis for assigning a higher value to one type than another.

■ I believe the best approach in this case will be to allow the rates requested by petitioners for each lawyer, up to a ceiling I believe consonant with the most demanding aspects of the successful work in the case. Any requested rate up to that level will be allowed. Any higher rate will be reduced to that level.

Petitioners have submitted the declaration of Herbert B. Newberg of the Philadelphia bar, who has written extensively on fee awards in class actions and complex litigation. Mr. Newberg expresses the view that current rates for experienced plaintiffs' counsel in complex litigation range from $150.00 per hour to $325.00 per hour. Exhibits to Fee Petition, Exh. F (Declaration of Herbert B. Newberg) at 11.

The work in this case could have been, and in large measure was, handled competently by lawyers whose 1988 billing rates were at the low end of Mr. Newberg's scale. Much of the work of the Much Shelist firm, for instance, was done by Michael B. Hyman, whose requested rate is $190.00 per hour. He participated in every aspect of the case, including the examination of witnesses in the Ernst & Whinney trial. I can think of no phase of the work that he could not have handled.[10] Mr. Hyman is a 1977 graduate of Northwestern University Law School and has participated in numerous antitrust, securities law and other complex class actions. He has served as chairman of the Antitrust Committee of the American Bar Association

---

**10.** Petitioners' responses to my various inquiries concerning the fee petition have all been made by Mr. Hyman, which is some indication of petitioners' confidence in him.

Section of Litigation. Exhibits to Fee Petition, Exh. C.

A member of the Sachnoff Weaver firm who participated extensively in all phases of the case, including examination of witnesses in the Ernst & Whinney trial, is Brian D. Roche. Mr. Roche has also appeared before me in the trial of an unusual employment discrimination case, *Ulane v. Eastern Airlines*,[11] Mr. Roche is a 1982 cum laude graduate of Georgetown University Law School, where he was a law review editor. In its separate petition for fees from the class, Sachnoff Weaver states that Mr. Roche's 1988 hourly rate was $145.00 per hour.

Another lawyer from Sachnoff Weaver who performed competently in all phases of the case was Barry S. Rosen. Mr. Rosen is a Phi Beta Kappa, magna cum laude graduate of the University of Illinois and a 1977 graduate of Harvard Law School. He has participated in numerous antitrust, securities and other complex cases. His 1988 hourly rate was $185.00 per hour.[12]

Although the hourly rates requested for many of the attorneys are well in excess of $200.00[13], it would not be necessary to pay that much to obtain competent counsel for this case, as is evidenced by the hourly rates of Messrs. Hyman, Roche and Rosen, as well as the fact that a large percentage of the work in the case was done by attorneys whose requested hourly rates were even less than those of Messrs. Hyman, Roche and Rosen.

I believe that a fair and reasonable maximum rate for services performed by class counsel in this case, based on 1988 market rates, is $175.00 per hour. This is the maximum rate I will apply, which means that all rates in excess of that amount will be cut to $175.00. Rates up to $175.00 an hour will not be reduced. This ceiling will result in a narrowing of the spread that petitioners probably think appropriate between the rates of senior partners and the more junior members of their firms. While the spreads may be justified in some cases, they were not in this one.

Paralegal and Law Clerk Rates

The three petitioning firms have requested hourly rates for their law clerks and paralegals ranging from $50.00 to $75.00. The hours run into the thousands, and the requested compensation for these persons is a substantial portion of the petition. Their activity is reflected in every category, in some more than in others. Major blocks of paralegal time are in Category No. 184, "Paralegal Activity Relating to Obtaining, Describing and Indexing Documents and Pleadings" (118 pages of entries, 2,929 hours, $165,000.00 requested); Category No. 185, "Paralegal Activity Relating to Development of Computerized Retrieval System" (41 pages of entries, 1,224 hours, $65,000.00 requested); and Category No. 186, "Paralegal Activity Relating to Identifying and Assemblying [sic] Documents in Preparation for Deposition and Other Discovery" (35 pages, 944 hours, $51,000.00).

The fee petition offers no justification for the requested hourly rates other than to state that these are the rates petitioners usually bill for their law clerks and paralegals. My post-petition correspondence with counsel has been helpful in clarifying their position. It struck me that a good starting point for the determination of a reasonable charge would be to find out what petitioners pay their law clerks and paralegals. This is the most objective indication of what an employer believes the services of an employee are actually worth. I requested petitioners to provide information as to the salaries or hourly pay received by each of the clerks and paralegals

11. 581 F.Supp. 821 (N.D. Ill.1983), *rev'd*, 742 F.2d 1081 (7th Cir.1984), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985).

12. Affidavit of Sachnoff, Weaver and Rubenstein, Ltd. in support of petition for fees at 6–8 and Exh. A.

13. Much Shelist: Lawrence H. Eiger $260.00; Michael J. Freed $285.00. Greenfield & Chimicles: Richard D. Greenfield $315.00; Nicholas E. Chimicles $275.00; C. Oliver Burt, III $275.00; R. Bruce McNew $225.00; Carol A. Broderick $240.00; Robert P. Frutkin $225.00. Lawrence Walner & Associates: Lawrence Walner $265.00.

in this case,[14] and the information was furnished.[15] Most of the clerks and paralegals were paid an annual salary. A few were paid a weekly salary or by the hour. Assuming 40 hour work weeks, I have converted the annual and weekly salaries into hourly rates. On this basis, the highest hourly pay received by any clerk or paralegal was $21.50 per hour. The majority were paid less than $10.00 per hour.

I then inquired of counsel how they had set the rates charged to clients for the services of the various law clerks and paralegals.[16] In response, petitioners advised that in determining hourly rates for paralegals and law clerks, they "consider their salary, all contractual benefits, direct and indirect overhead expenses as well as a reasonable profit margin." They also investigate the rates charged by other law firms and the rates approved by state and federal courts in recent fee opinions.[17] I then inquired whether there is a *specific* relationship among these factors: "Assume, for instance, that the salary of the paralegal is $10.00 per hour. How is the billable rate for that paralegal computed? What are the specific figures for benefits, overhead and profit margin?"[18] The response was that there is no specific relationship among the factors and that the specific figures are unavailable:

> Your Honor's letter of August 30 requests information concerning the "specific relationship among [the salary benefits, overhead expenses and a reasonable profit margin]" in the setting of rates of paralegals and law clerks at petitioners' firms. In fact, there is not a specific relationship between these factors and the rates set for the law clerks or paralegals at any of the petitioners' firms. That is to say, none of the firms has a

mathematical formula into which numbers are plugged for salary, overhead, and profit to arrive at a specific rate. To our knowledge, no law firm, either plaintiff or defendant oriented, sets rates in such a manner.

* * * * * *

None of the firms has ever performed a computation of overhead for a law clerk or paralegal for purposes of determining an hourly rate. Such a computation cannot be made retrospectively since overhead components vary from employee to employee on a continuous basis. Nor do our firms compute a profit margin attributable to a paralegal or law clerk or use a profit margin to arrive at an appropriate hourly rate.[19]

Petitioners explain that they believe their rates are nonetheless reasonable, since they are based on what other firms are charging, what their own clients are paying in non-contingent fee cases, and what courts are approving in cases where they are called upon to determine appropriate law clerk and paralegal rates.[20]

The positions taken by petitioners seem inconsistent. On the one hand, they say they take into consideration "salary, all contractual benefits, direct and indirect overhead expenses as well as a reasonable profit margin,"[21] but, when asked to be more specific, admit that they cannot be more specific. It seems a fair inference that what petitioners mean is that salary, benefits and overhead are "considered" in the sense that they are certainly going to be covered by the rate charged. The services are not going to be rendered at cost or at a loss. But what petitioners do *not* mean is that the cost of providing the ser-

**14.** Court's letter to Michael B. Hyman dated July 27, 1990.

**15.** Letter to court from Michael B. Hyman dated August 13, 1990. "The salaries or hourly wage listed are for 1988, or earlier in the case of employees who were no longer employed in 1988." *Id.* at 2.

**16.** Court's letter to Michael B. Hyman dated August 22, 1990.

**17.** Letter to court from Michael B. Hyman dated August 29, 1990.

**18.** Court's letter to Michael B. Hyman dated August 30, 1990.

**19.** Letter to court from Michael B. Hyman dated September 11, 1990.

**20.** *Id.*

**21.** Letter cited n. 17, *supra.*

vices is any kind of *limitation* on the rate that will be charged the client. That rate, when all is said and done, is determined by what the traffic will bear—what other firms are charging, what clients are paying, what courts will approve. In short, the rates are set by "the market."

If the fact that given rates have been paid by clients and approved by courts were, of itself, sufficient proof that the rates are reasonable, that would end the matter. But it is not that simple. For one thing, not all courts would agree that the $50.00, $65.00 and $75.00 per hour rates requested by petitioners for their law clerks and paralegals are reasonable. *See, e.g.,* the holding of Judge Stanley J. Roszkowski in *People Who Care v. Rockford Bd. of Education, School District No. 205,* No. 89 C 20168, 1990 WL 25883, *5 n. 4 (N.D.Ill. Feb. 23, 1990), disallowing the rates requested in that case for attorneys and paralegals:

> The rates allowed by this court are approximately 75% of the amounts originally requested by Plaintiffs' counsel. The one exception is the rate awarded to the paralegals. The paralegal rate is one-half the amount requested. The court refuses to believe that $60.00 is a reasonable hourly rate for paralegal work. As such, the court declines to make paralegals a profit-making venture. The court, however, believes that the $30.00 per hour rate awarded for paralegal work still gives the Plaintiffs' law firm a reasonable profit.

It is important to recognize that there is an ethical component in this calculation that is not present in ordinary commercial transactions. If everyone were willing to pay unreasonably high prices for shoes, this would mean that the market price of shoes is unreasonably high, but it would still be the market price. Absent a price-fixing combination, the sellers and buyers of shoes would be left to their own devices. But where payment for legal services is concerned (and surely paralegal services as well), ethical considerations intervene. Rule 2–106 of the Illinois Code of Professional Responsibility, which was in effect until July 31, 1990, provided that a lawyer shall not charge or collect "an illegal or excessive fee." Rule 1.5 of the new Illinois Rules of Professional Conduct, effective August 1, 1990, contains a similar provision: "A lawyer's fee shall be reasonable." [22] The disciplinary rules are applicable to fee awards made by courts, *Waters v. Wisconsin Steel Works,* 502 F.2d 1309, 1322 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). While it may be appropriate to presume in the first instance that the "market" rates for paralegal services are reasonable, *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 2471–72, 105 L.Ed.2d 229 (1989), any such presumption should not be conclusive. The ultimate question is not the market rate but a reasonable rate, of which the market rate may be evidence. When examination reveals, as it has here, that there is no definable relationship between the cost of the service and the rate petitioners charge for it, any presumption of reasonableness disappears.

Even if there were an articulable relationship between petitioners' costs and their customary rates for paralegal services, a further question is what those services are really worth to the client, regardless of what they may cost petitioners. With very few exceptions, it is impossible to tell from the petition in this case just what work the paralegals actually did and how it benefitted the class. Typically, five and six hour blocks of time are labeled simply "organizing files" or "reviewing," "indexing" or "filing" materials described in general terms.[23] The fact that clients pay, and judges approve payment, of statements of this kind for paralegal services is not persuasive evidence that the hourly rates are reasonable. Too often, the clients and the courts are simply acquiescing in the rates set by counsel without making any independent evaluation of their reasonableness.

---

**22.** The rule, like its predecessor, lists a number of factors relevant to the determination of a reasonable fee.

**23.** *See, e.g.,* Categories 184, 185, 186.

■ Neither petitioners nor I have found a reported case in which a system or formula for setting paralegal rates has been suggested. Reference to the "market" is usually the beginning and the end of any discussion. A better method is overdue. The number of paralegals is increasing each year, and the charges for their activities are a growing expense to the users of legal services. It is clear that the value of these activities cannot be ascertained from time entries of the kind contained in this petition, which are similar to the entries contained in most fee petitions I have seen. Something more concrete is needed. As indicated earlier, I believe an appropriate starting point is the salary paid the paralegal by the attorney.

Another proper component of the rate is the overhead specifically associated with the employee, such as health insurance and other fringe benefits. It is unfortunate that petitioners did not provide this kind of information. It seems to me that with sufficient effort it could have been produced and that it would have been produced had petitioners thought it supported the rates they are asking.

Finally, the billing rate should include an element of profit. Lawyers will not be motivated to assign non-legal work to paralegals if there is no profit in it. Instead, they may do the work themselves and charge lawyer rates for it. On the other hand, if the profit is unreasonably high, there could be a temptation to create unnecessary work for paralegals to do.

The problem in this case is that the profit is too high. It should bear an ascertainable and defensible relationship to petitioners'

actual costs. Petitioners impliedly acknowledge this when they state that their customary rates include "a reasonable profit margin."[24] Profit is the difference between cost and the rate charged. The lack of information as to the overhead fairly attributable to petitioners' law clerks and paralegals makes the analysis difficult, but not impossible. It seems rational to presume that, up to a given salary level, the specific overhead for an employee would not exceed the employee's salary. Thus, if the paralegal is paid $10.00 per hour, an allowance of an additional $10.00 for specific overhead seems adequate and probably generous.[25] Based on an 8–hour day, that would be $80.00 per day to cover overhead specific to that employee. It is unlikely that the specific overhead costs would exceed $80.00 per day even if the salary of the paralegal were substantially in excess of $10.00 per hour. For this reason, it seems proper to cap the overhead component at $10.00 per hour.

The formula, then, would work like this: if the pay of the paralegal is, say, $8.03 per hour, an additional $8.03 per hour would be allowed for specific overhead. If the pay is $10.00 per hour, an additional $10.00 per hour would be allowed for overhead. If the pay is more than $10.00 per hour, the allowance for overhead would still be $10.00 per hour.

The final question is what to allow for profit. From my general knowledge of law firm economics, I believe a 40 percent profit would be considered adequate by most lawyers. That percentage seems appropriate in this case. The highest paid clerk or

---

24. Letter cited n. 17, *supra.*

25. According to the United States Department of Labor, Bureau of Labor Statistics, employer costs for employee compensation in private industry averaged $14.96 per hour worked in March 1990. Straight-time wages and salaries (72.4 percent of the costs) averaged $10.84, while benefit costs (27.6 percent of the total) averaged $4.12 per hour. *News,* Bureau of Labor Statistics, Washington, D.C. 20212, USDL 90–317, June 19, 1990, "Employer Costs for Employee Compensation—March 1990". The study breaks down the statistics by category of employee. The average total compensation for white-collar workers in service-producing indus-

tries is $16.64 per hour, consisting of $12.38 (74.4 percent) for wages and salaries, and $4.25 (25.6 percent) for benefits. White-collar workers are further subdivided into several categories, and it appears that "[a]dministrative support, including clerical" is the category most nearly descriptive of paralegals. (*See* the hourly salaries for the law clerks and paralegals in this case listed in Appendix A, *infra.*) Total compensation for this sub-category is $12.32 per hour, with $8.93 per hour (72.4 percent) paid in wages and salaries, and the remaining $3.40 per hour (27.6 percent) for benefits. *Id.* Table 7, p. 10.

paralegal in the case was paid $21.50 per hour. Adding $10.00 per hour for overhead would bring petitioners' cost for this employee to $31.50 per hour. Forty percent of this amount would be $12.60 per hour, or $100.80 profit for an eight-hour day. (If the overhead figure of $10.00 per hour is higher than petitioners' actual costs, then, of course, the profit margin is increased.) The rate allowed on this basis would be $44.10 per hour, rather than the $65.00 per hour requested by petitioners.

While the 40 percent profit margin seems equitable in this case, I do not suggest it would necessarily be appropriate in all cases. One problem with a fixed percentage might be that it would encourage counsel to maximize profit by overpaying paralegals or using only the most highly paid paralegals for tasks that could be competently handled by lower paid employees. The solution for that problem might be to have a diminishing scale of profit when the salary of the employee reaches a certain level. Consideration might also be given to allowing counsel a certain minimum hourly rate for paralegal work so that there will be no disincentive to use employees who can do the work but whose skills do not command more than minimum hourly rates. That concern is not substantial in this case, because only three or four of petitioners' forty law clerks and paralegals were paid less than $8.00 per hour. Moreover, it is doubtful that petitioners had any idea their costs were going to be analyzed in this manner.

A chart appended to this opinion (Appendix A) shows the initials of the clerks and paralegals for each of the petitioning firms, the hourly rates requested in the petition, the employee's pay computed on an hourly basis, and the reduced hourly rates I will allow according to the method just discussed, rounded to the nearest dollar. I have assumed 40 hour weeks and have considered every hour fully billable. This is generous treatment for petitioners, since there is no more reason to believe that every hour a paralegal is physically present on the job is properly billable than there would be to make the same assumption in regard to a lawyer's time. Every lawyer knows there is a significant difference between physical presence and properly billable time.

Mr. Walner was unable to locate his records pertaining to the salaries of his paralegals, but recalls that their pay ranged from $7.50 per hour to $13.00 per hour. I have averaged those two figures to arrive at pay rate of $10.25 an hour, which is comparable to the pay of the paralegals at the other two firms.

## C. The Question of Multipliers

Petitioners ask that they be paid not simply their hourly rates for the number of hours worked but that they be awarded a "multiplier" of 1.68 for the work of Much Shelist and Greenfield & Chimicles, and 1.48 for Lawrence Walner, for all Stage One work, specifically including all work relating to Ernst & Whinney. The multiplier would apply to both attorney and paralegal time. Petitioners also seek a multiplier of 1.2 for their work on the D & O claims in Stages Two and Three. The total requested multipliers would add $2,397,410.00 to petitioners' lodestar fees.

Petitioners suggest that their work warrants "multipliers of 2 or more" (Memorandum at 11 n. 8), but they have requested the lower percentages because of their earlier representation to the class that they would seek no more than $9 million in attorneys' fees.

Petitioners urge several reasons why they are entitled to these multipliers. They emphasize the size of the fund that has resulted from the litigation. However, it is difficult to assess the degree of "success" this fund represents, because calculation of plaintiffs' damages is so speculative. Petitioners argue now that the class has recovered a major percentage of its actual damages. That is not the tack they took after the initial settlement and while they were pursuing Ernst & Whinney. Then, they estimated the class damages as high as $111 million. The $38 million in settlements is about 35 percent of that amount.

Petitioners quote the language, "the most critical factor is the degree of success

obtained," from *Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), but the case is inapposite. The Court was not discussing multipliers, but the question of how the *lodestar* should be calculated when plaintiffs had succeeded on only some of their civil rights claims against the defendant. The "degree of success" went to the question of whether plaintiffs would be compensated *at all* for the hours spent on the unsuccessful claims. The Supreme Court case petitioners should have cited on multipliers, but have not,[26] is *Blum v. Stenson, supra,* where the Court, dealing specifically with the question of a multiplier, stated that the quality of representation

> may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.' See *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940.

*Blum*, 465 U.S. at 899, 104 S.Ct. at 1549. I do not believe this is that "rare" case where "exceptional" results justify a multiplier.

Petitioners argue that the "magnitude and complexity of the litigation" justify a multiplier. Memorandum at 56–57. Again, *Blum* is clear that this is not a proper basis for a multiplier:

> The novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee based on the number of billable hours times reasonable hourly rates.

465 U.S. at 898, 104 S.Ct. at 1549.

The closest petitioners come to a good argument for a multiplier is that they took the case on a contingent basis and should be compensated for the risk of non-payment. As the court stated in *Skelton v. General Motors Corp.*, 860 F.2d 250, 258 (7th Cir.1988):

> [W]hen attorneys' receipt of payment is contingent on the success of the litigation, reasonable compensation may demand more than the hourly rate multiplied by the hours worked, for that is exactly what the attorneys would have earned from clients who agreed to pay for services regardless of success. Thus, to account for the contingent nature of the compensation, a court should assess the riskiness of litigation. This task is not without its problems. First, it entails a retroactive calculation of probability of success as measured at the beginning of litigation. Second, it places plaintiff's lawyers in the unseemly position of convincing the court that their clients' case was weak.

Few civil cases are undertaken by counsel on the assumption that they will have to be tried to verdict. Over 97 percent of the civil cases in this district are concluded without trial.[27] Most cases, including class actions, are settled, and counsel have the probability of settlement in mind from the outset. Petitioners argue that the unfavorable result in the Ernst & Whinney trial is the best indication of the risks they were conscious of taking at the outset of this case (Memorandum at 52), but I think the settlements with Continental and the D & O carriers are more likely the kind of thing counsel had in mind at the outset. The Ernst & Whinney case was clearly more difficult than the cases against the bank and the individual defendants. Information widely available to the public in July 1982 gave counsel good reason to believe that the bank and its officers had been aware of, or had recklessly disregarded, warning signs concerning its energy loan

---

26. Petitioners' selective citation of authority is a troubling aspect of their petition. It aggravates an already difficult task, especially in the absence of the adversary process. *See* comment of Third Circuit Task Force, p. 878, *supra*.

27. Clerk, United States Court of Appeals for the Seventh Circuit, *The Judicial Business of the*

portfolio.[28] Facts that were recklessly disregarded by the bank and its officers were set out in some detail in the consolidated complaint filed November 3, 1982, complete with citations to Congressional testimony, published interviews of Continental officers, and reports of the Comptroller of the Currency. Consolidated Complaint, ¶ 28. Many of these same facts were alleged in the earlier complaints filed by Mirochnick, Goodman, Steinlauf and Bleier. Financial statements of Continental, certified by Ernst & Whinney, gave no hint of the precarious state of its energy loans and the almost incredible lack of internal audit controls. On the contrary, the statements portrayed Continental as a sophisticated energy lender with a high quality portfolio. Under these circumstances, it is likely that when counsel took this case they were optimistic about the prospects of a settlement with the bank and its officers—a settlement large enough to compensate counsel fully for all services they might render. Their immediate commitment of massive—indeed, excessive—amounts of time to the case belies the proposition that they believed equally lucrative and less risky opportunities were available elsewhere.[29] The initial attractiveness of the case is evidenced by the fact that Mirochnick, Goodman and Bleier, who had never owned shares of Continental before, obviously purchased shares for the very purpose of filing suit. The record does not show when counsel were engaged in relation to the purchases, but clearly the plaintiffs had no difficulty obtaining representation. Their suits were filed very shortly after their purchases.

Counsels' enthusiasm continued undiminished throughout the early stages of the litigation. They fought hard to have their respective clients certified as class representatives, even though they knew or should have known that this was not in the interest of the class, apparently believing that this was the only way they could be sure of remaining as counsel in the case. None of the large array of lawyers seeking to represent the class dropped out voluntarily.

In short, this looked like a good case and counsel were eager to be part of it. Any ambivalence caused by a consciousness of having forsaken fees they "would have earned from clients who agreed to pay for services regardless of success," *Skelton, supra,* was not apparent. Their optimism was justified as far as the bank and the individual defendants were concerned. The bank paid $25 million to settle, and the D & O carriers, in settling with the class and the FDIC, paid the lion's share of their coverage. These defendants were sophisticated parties, represented by experienced counsel. They paid no more than they thought necessary in light of the facts that were basically known by petitioners at or about the time the complaints in this case were filed.

The risk of non-payment was no deterrent whatever to plaintiffs' ability to retain counsel in this case. I believe it is not a case in which a contingency multiplier can be justified, even for Stage One.[30] Still less could it be justified for work on the D & O claims in Stages Two and Three. Once the $25 million dollars had been paid by the bank, any risk of non-payment that arguably had existed was no longer there. The settlement fund was available for the payment of fees for further work, and everyone knew it. I gave preliminary approval to the settlement with the bank and the individual defendants in April 1986. The order finally approving the settlement was entered on July 25, 1986. Of the 2,270 attorney and paralegal hours requested for work on the D & O claims, 1,918 hours, or

*United States Courts of the Seventh Circuit* (1989), Table C–4, p. 26.

**28.** *See* the Sachnoff Weaver statement of services quoted at pp. 897–898, *infra.*

**29.** The assumption of an indefinitely elastic market for legal services, created by clients able and willing to pay non-contingent fees, should probably receive more scrutiny than it has in the published discussions of risk multipliers in contingent fee cases.

**30.** Petitioners do not explain the basis of the requested multiplier for the time they spent during Stage I on the Ernst & Whinney claim, an unsuccessful part of the case.

82 percent of the total, were spent after that date.

I conclude that the risk of non-payment in Stage One of the case was not sufficient to warrant a contingency multiplier. The possibility of non-payment was simply not a consideration in Stages Two and Three.

No multiplier will be allowed.

*D. Interest*

■■■ In addition to their fees, petitioners ask for what they argue is their share of the interest which has been earned on the settlement fund. They calculated their share at $1.15 million, through December 31, 1989. Class Counsel's Final Petition for Award of Attorneys' Fees and Reimbursement of Expenses at 2. They argue that the fund

> has, in effect, been earning interest on the amounts due counsel whose efforts created the Fund. Since the Settlement Fund would not have earned that interest had petitioners been paid when the Fund was created, and since the Fund would be unjustly enriched at petitioners' expense over and above the time value of money and loss of investment opportunity embodied in the use of current rates, an award of such interest is required.

Memorandum at 32. Thus, petitioners argue that they are entitled to *both* current rates and interest. They cite *In re Fine Paper Antitrust Litigation*, 751 F.2d at 588, and *In re Cincinnati Gas & Elec. Co. Securities Lit.*, 643 F.Supp. 148, 153 (S.D. Ohio 1986), in support of their position. In neither of these cases was the lodestar calculated at current rates.[31] In *Fine Paper*, the court pointed out that the trial judge specifically refused to apply current rates. 751 F.2d at 588. These cases are not authority for petitioners' view that they are entitled to be compensated twice for delay in payment. The law in this circuit was stated in *Skelton v. General Motors Corp.*, 860 F.2d at 255 n. 5:

> Delay in payment may be compensated in either of two ways: (1) by using the attorneys' current rates (as the district

court did here); or (2) by using historical rates plus a prime rate enhancement. The courts in this circuit generally use current rates.

*See also Lightfoot v. Walker*, 826 F.2d 516, 523 (7th Cir.1987) (approving trial court's use of current rates rather than interest to avoid a "windfall" to counsel).

Inasmuch as I have applied what I believe to be the appropriate rates for 1988, the year requested by petitioners, the delay factor has been adequately addressed. Petitioners are no more entitled to a share of the interest on the settlement fund in addition to current rates than they are entitled to a share of the settlement fund in addition to their fees. There will be no award of interest.

### III

### SEPARATE PETITIONS OF OTHER LAW FIRMS

Three law firms have filed petitions for compensation based on what they did while serving as co-counsel for the class during the period August 1982 through April 1984. The Chicago firm of Sachnoff Weaver was on the Bleier complaint. (Sachnoff Weaver handled the derivative (FDIC) claim after April of 1984.) The New York firm of Bernstein Litowitz Berger & Grossman ("Bernstein Litowitz") also did work in connection with the Bleier complaint. The New York firm of Wolf Haldenstein Adler Freeman & Herz ("Wolf Haldenstein") was one of the firms listed on the Andrew Goodman complaint. These firms have computed their requested lodestars on the basis of the hours they describe as benefitting only the class, multiplied by their 1988 hourly rates. Sachnoff Weaver requests $63,353.75; Wolf Haldenstein $18,907.00; and Bernstein Litowitz $24,365.00. Sachnoff Weaver requests a multiplier of 1.68; the other two firms request multipliers of 1.48.

■■■ I asked class counsel to comment on these separate petitions. They have done so, and a somewhat heated argument has ensued. Class counsel make clear that

---

**31.** *See* n. 26, p. 894, *supra.*

they have no objection to the claimed hours or the requested rates, which range up to $315.00 per hour. Instead, class counsel object to these separate petitions on the basis that, because class counsel waived fees from the FDIC for work they had done in the derivative action, the separate petitioners, from the standpoint of "symmetry," should be willing to waive any fees for work they did which benefitted the class. Letter of Class Counsel to Court dated July 19, 1989. Class counsel suggest that they waived fees from the FDIC in order to forestall a claim by the FDIC against the class for recoupment of fees it paid for work that benefitted the class. The separate petitioners discount this benevolent motive and suggest that counsel's waiver of fees from the FDIC is based on "reasons best known to them—but reasons that must have served their interests...." Letter to Court from Lowell E. Sachnoff dated July 31, 1989, p. 2.[32] The separate petitioners argue that, whatever may have motivated the waiver, the fact that class counsel waived fees from the FDIC for their work on the derivative claims is no basis for denying petitioners fees for their work which solely benefitted the class. This would, they say, be a "non-sequitur." I agree, and will consider the separate petitions on their merits.

### A. Petition of Sachnoff Weaver

One of the side effects of too many lawyers in a case is that, however friendly they may be when they perceive their initial interests to be mutual, the situation changes radically when that perception is no longer shared. In the affidavit supporting its fee petition, Sachnoff Weaver states:

Our firm had significant responsibility for representing the class throughout the nineteen month period in which we served as co-lead counsel for the class.

Mr. Sachnoff had primary responsibility for strategy and decision-making with respect to class issues during this period. Affidavit of Sachnoff Weaver & Rubenstein, Ltd. in Support of Petition for Fees at 2. In their letter opposing the separate petitions, class counsel state:

Class counsel has shouldered and dominated the Class litigation for seven years. The Derivative Firms played a supporting role in the Class litigation for a very short time period and their "pure" class work, as evidenced by their applications, is quite limited.

Letter of Class Counsel to Court dated July 19, 1989, p. 4.

Whoever was in charge, it is clear that the various firms, as was inevitable, were duplicating each other's work to a considerable extent.

The Sachnoff Weaver petition requests compensation for nine categories of work, and, like the petition of class counsel, contains a statement of services for each category.

Category 1 "Research and Drafting Consolidated Complaint and Investigation for Rule 11 Compliance"

■ Sachnoff Weaver, according to the affidavit in support of its petition, "took on primary responsibility for drafting a consolidated complaint." It will be recalled that class counsel have been allowed over 50 hours for work on the consolidated complaint (Category No. 3). The Sachnoff Weaver time entries include far less conference time and much more individual effort in researching and drafting than do the entries of class counsel in regard to the consolidated complaint. In its statement of services for this category (page 1), Sachnoff Weaver points out:

Fortunately, there was a great deal of information including SEC filings, annual statements and quarterly statements, public statements (reported in the press) by Continental officials (found by Nexus

---

**32.** I am inclined to agree with Mr. Sachnoff that class counsel were not disregarding their own interests, which probably would not have been well served by a dispute over who rendered the most valuable services to the class. On the other hand, it is not clear what legal basis the FDIC would have to claim reimbursement from the class for fees it paid its own counsel, even if their services did incidentally benefit the class.

search), numerous newspaper and business journal articles, and the documents and testimony generated by two Congressional investigations. Most of the time spent by our firm was spent in reviewing and analyzing this factual record and in drafting carefully so as to meet the strict pleading requirements for this type of action.[33]

This same material was examined by attorneys from Much Shelist, Chimicles & Greenfield, and Lawrence Walner in connection with their work on the initial and consolidated complaints, for which they have been allowed compensation. While I have a sense that the Sachnoff Weaver time may have been more productive, it would be inequitable to deny compensation to the other attorneys who spent time on the consolidated complaint, and it is therefore a matter of attempting to spread a reasonable number of hours over what can only be regarded as too many participants. Class counsel's time was reduced by 50 percent for the corresponding category, and Sachnoff Weaver's 62 hours ($11,016.25 requested) on the consolidated complaint will be reduced by 30 percent.

Category 2 Memoranda in Opposition to Motions to Dismiss Class Portions of Consolidated Complaint

■ This category corresponds to Category No. 17 of class counsel, where the 690 attorney hours claimed were reduced by 40 percent. Sachnoff Weaver claims 47.75 hours ($9,587.50 requested), most of which were spent by one attorney in legal research and drafting various sections of the single brief that was filed in opposition to the several motions to dismiss the consolidated complaint. The time in this category appears reasonable and will be allowed.

Category 3 Discovery of Class Representatives

■ This corresponds to Category No. 36 of class counsel's petition, and concerns preparation of the various would-be class representatives for their depositions. Sachnoff Weaver claims 21.25 hours

($4,007.50 requested). Much of this work was generated by the simple fact that Goodman, Mirochnick and Bleier had purchased their shares for the purpose of filing suit. The effort to certify these unsuitable persons as class representatives did not benefit the class. Only one class representative was certified, and this was all that was needed as far as the interests of the class were concerned. The time in this category will be reduced by 75 percent.

Category 4 Motion for Class Certification and Related Issues

This claim is for the 30.50 hours ($5,583.75 requested) spent on the issues of which class representatives would be certified and what period of time would constitute the class period. As discussed in earlier portions of this opinion, the positions taken by counsel on these issues did not serve the interests of the class. The time in this category will be reduced by 75 percent.

Category 5 Briefing Re Dual Representation

Sachnoff Weaver seeks compensation for 11 hours ($2,167.50 requested) spent attempting to convince me that there was no conflict between the interests of the class and the interests of the corporation in the derivative action. This category corresponds to Category No. 21 in class counsel's petition, and, as I did there, I will disallow this time.

Category 6 Class Merits Discovery

■ The 7 hours ($1,352.00 requested) claimed in this category correspond to Category Nos. 44 and 37 of the petition of class counsel. There is no apparent duplication; these hours will be allowed.

Category 7 Research and Drafting of Memoranda in Support of Class Motion to Obtain Discovery of Special Litigation Committee Materials

Continental Illinois Corporation established a Special Litigation Committee to decide whether to bring suit against the bank officers and directors and Ernst &

---

**33.** This statement is relevant to the discussion of a contingency multiplier at p. 895, *supra*.

Whinney. The Committee generated considerable paper during its investigation, and an issue arose as to whether class plaintiffs—as opposed to the derivative plaintiff—were entitled to discover that material, as against claims of privilege. Sachnoff Weaver claims 120.75 hours ($21,-892.50 requested) for legal research and drafting of the memorandum in support of class plaintiffs' right to discovery of the Special Litigation Committee material. The difficulty is that class counsel, in their Category No. 175, claim 165 hours ($28,-000.00 at their requested rates) for research and drafting of the same memorandum. The time entries are similar in many respects, such as those indicating various lawyers were reading the same cases. The combined work resulted in two briefs, one of 11 pages, the other of 15 pages. The work reflected in these memoranda should not have required 285 attorney hours to produce. The hours in Category 7 of the Sachnoff Weaver petition will be reduced by 30 percent, which is the same reduction I applied to class counsel's Category No. 175.

Category 8 Settlement and Damages Issues

■■■ This work relating to the settlement with the bank appears to have been substantive, and the 23.75 hours will be allowed.

Category 9 Class Claims v. Ernst & Whinney

■■■ Twelve hours are claimed for research concerning accountants' liability under the federal securities laws. The time will be allowed.

## B. Petition of Wolf Haldenstein

This firm seeks compensation for work in three categories.

(a) Preparation of Goodman Complaint (Exhibit B)

■■■ A total of 16.3 hours ($4,982.50 requested) is claimed. The mixed nature of the time entries makes it impossible to tell how much time was spent in conferences with members of other law firms, but it

appears that 50 percent would be a good guess. Time spent by Much Shelist on the Goodman complaint is included in Category No. 2 of class counsel's petition. The time in this category of the Wolf Haldenstein petition is reduced by 50 percent.

(b) Class Discovery (Exhibit C)

■■■ This category of 28.9 hours ($6,606.50 requested) consists almost entirely of telephone conferences and correspondence with attorneys for other aspirants for class representative status. There is no indication what was discussed or what good it did. The time is reduced by 75 percent.

(c) Plaintiffs' Memorandum of Law in Opposition to Defendant Redding's Motion to Dismiss (Exhibit D1)

■■■ This work was legal research and drafting. A total of 41.6 hours ($7,318.00) are claimed. Much of the work has to do with Bleier's derivative action. The time entries do not indicate how the time was divided between the issues that affected the class action and those which did not.

The time in this category will be reduced by 50 percent.

## C. Petition of Bernstein Litowitz

This firm claims fees for two categories of work.

Category 1—Background Investigation and Drafting Complaint

■■■ The time entries, totalling 22.50 hours ($6,702.50 requested), indicate that most of the time was spent in conferences among counsel. There is the usual lack of any explanation as to what was discussed and what was accomplished.

The time in this category will be reduced by 30 percent.

Category 2—Damage Analysis

■■■ The time claimed in this category is 80.00 hours ($17,662.50 requested). The work was legal research on the measure of damages in securities fraud cases and the preparation of a 21-page memorandum on that subject. This is too much time, consid-

ering the basic nature of the research and the fact that Bernstein Litowitz represents itself to be a firm that "is engaged in major complex securities actions throughout the United States." Exhibit B to Declaration. The time will be reduced by 50 percent.

### D. Hourly Rates and Multipliers

The discussion at pp. 884–889, 893–896, *supra,* concerning appropriate hourly rates and the propriety of multipliers for the work of class counsel is also applicable to the work of these separate petitioners. The maximum hourly rate that can be justified is $175.00. No multipliers are warranted.

Sachnoff Weaver requests compensation for 3.5 hours spent by a paralegal who was paid $9.62 per hour and for 12 hours spent by a summer associate who was paid $17.50 per hour. Compensation will be allowed on the same basis used for class counsels' law clerks and paralegals, pp. 889–893, supra.

## IV

### FURTHER PROCEDURE

All petitioners should now compute the fees to which they are entitled under the terms of this opinion and submit appropriate draft orders authorizing payment of those amounts. Each proposed order should be accompanied by an affidavit of counsel explaining the calculations and affirming that the reductions in hours and hourly rates required by this opinion are accurately reflected in the order submitted. These submissions should be made by October 31, 1990.

## APPENDIX A

Much Shelist Freed Denenberg Ament & Eiger, P.C.

| Initials | Hourly Rate Requested | (Annual)* Salary | (Hourly) Salary | (Per Hour) Overhead Allowed | (Per Hour) Profit Allowed | Hourly Rate** Allowed |
|---|---|---|---|---|---|---|
| MEC | $50.00 | $17,500 | $ 8.41 | $ 8.41 | $ 6.73 | $24.00 |
| DPJ | 55.00 | 19,360 | 9.31 | 9.31 | 7.45 | 26.00 |
| LAH | 55.00 | 26,630 | 12.80 | 10.00 | 9.12 | 32.00 |
| GLK | 60.00 | 18,475 | 8.88 | 8.88 | 7.10 | 25.00 |
| MJM | 60.00 | 20,155 | 9.69 | 9.69 | 7.75 | 27.00 |
| M–S | 55.00 | 16,695 | 8.03 | 8.03 | 6.42 | 22.00 |
| MVV | 55.00 | 27,955 | 13.44 | 10.00 | 9.38 | 33.00 |
| RAM | 55.00 | 16,800 | 8.08 | 8.08 | 6.46 | 23.00 |
| RJJ | 55.00 | 22,050 | 10.60 | 10.00 | 8.24 | 29.00 |
| AFD | 75.00 | 44,500 | 21.39 | 10.00 | 12.56 | 44.00 |
| ECT | 55.00 | 20,000 | 9.61 | 9.61 | 7.69 | 27.00 |
| LME | 55.00 | 20,000 | 9.61 | 9.61 | 7.69 | 27.00 |
| AEC | 55.00 | 18,420 | 8.85 | 8.85 | 7.08 | 25.00 |
| TLC | 55.00 | 18,900 | 9.09 | 9.09 | 7.27 | 25.00 |
| EHS | 55.00 | 22,500 | 10.82 | 10.00 | 8.33 | 29.00 |
| DEK | 55.00 | 10,000 | 4.81 | 4.81 | 3.85 | 13.00 |
| RSC | 55.00 | 12.50 (hr) | 12.50 | 10.00 | 9.00 | 31.00 |
| CHO | 55.00 | 16,725 | 8.04 | 8.04 | 6.43 | 23.00 |
| DIF | 65.00 | 17.00 (hr) | 17.00 | 10.00 | 10.80 | 38.00 |
| F–M | 65.00 | 21.50 (hr) | 21.50 | 10.00 | 12.60 | 44.00 |
| GAR | 65.00 | 20.00 (hr) | 20.00 | 10.00 | 12.00 | 42.00 |
| Greenfield & Chimicles | | | | | | |
| BWW | 75.00 | $ 325 (wk) | $ 8.12 | $ 8.12 | $ 6.50 | $23.00 |
| SEO | 75.00 | 375 (wk) | 9.37 | 9.37 | 7.50 | 26.00 |
| LCA | 75.00 | 8.75 (hr) | 8.75 | 8.75 | 7.00 | 24.00 |
| PAB | 65.00 | 18,000 | 8.65 | 8.65 | 6.92 | 24.00 |
| M–H | 50.00 | 17,000 | 8.17 | 8.17 | 6.54 | 23.00 |
| AFK | 65.00 | 22,000 | 10.58 | 10.00 | 8.23 | 29.00 |
| LDM | 75.00 | 31,000 | 14.90 | 10.00 | 9.96 | 35.00 |
| RJM | 55.00 | 16,500 | 7.93 | 7.93 | 6.34 | 22.00 |
| NJS | 60.00 | 16,500 | 7.93 | 7.93 | 6.34 | 22.00 |
| WAS | 65.00 | 18,500 | 8.89 | 8.89 | 7.11 | 25.00 |
| JRT | 75.00 | 12.50 (hr) | 12.00 | 10.00 | 8.80 | 31.00 |
| CAT | 50.00 | 18,500 | 8.89 | 8.89 | 7.11 | 25.00 |

| Initials | Hourly Rate Requested | (Annual)* Salary | (Hourly) Salary | (Per Hour) Overhead Allowed | (Per Hour) Profit Allowed | Hourly Rate** Allowed |
|---|---|---|---|---|---|---|
| MAM | $55.00 | $31,500 | $15.14 | $10.00 | $10.05 | $35.00 |
| PLH | 50.00 | 13,500 | 6.49 | 6.49 | 5.19 | 18.00 |
| DMS | 55.00 | 11,700 | 5.62 | 5.62 | 4.50 | 16.00 |
| ACK | 50.00 | 16,500 | 7.93 | 7.93 | 6.34 | 22.00 |
| Lawrence Walner & Associates*** | | | | | | |
| CRS | 65.00 | | 10.25 | 10.00 | 8.10 | 28.00 |
| LMC | 65.00 | | 10.25 | 10.00 | 8.10 | 28.00 |
| MEG | 65.00 | | 10.25 | 10.00 | 8.10 | 28.00 |

\* Letter cited at n. 15; letter to court from Michael B. Hyman, dated August 20, 1990.

\** Rounded to nearest dollar.

\*** Letter cited at n. 15; *see* discussion p. 893, *supra.*