## In re CONTINENTAL ILLINOIS SECURITIES LITIGATION.

### No. 82 C 4712.

United States District Court,
N.D. Illinois, E.D.

May 19, 1993.

**1.** *In Re Continental Illinois Securities Litigation,*

Lowell E. Sachnoff, Sachnoff & Weaver,
Chicago, IL, for petitioner.

## ORDER

GRADY, District Judge.

In a mandamus proceeding which relates
to this case, I have been ordered to file a
response to petitioners' motion for a ruling
on class counsel fees. A copy of that re-
sponse is attached to this order and made a
part of the record in this case.

In The United States Court of Appeals
for the Seventh Circuit

No. 92–4088

Much Shelist Freed Denenberg
Ament & Eiger, P.C., et al.
Plaintiffs–Petitioners,

v.

The Honorable John F. Grady, Respondent.

### RESPONSE TO PETITIONERS' MOTION FOR A RULING ON CLASS COUNSEL FEES

On February 18, 1993, I filed a memoran-
dum opinion [1] responding to the direction of

813 F.Supp. 633 (N.D.Ill.1993).

this court issued on January 21, 1993,[2] that I enter an order describing a procedure and timetable for a final fee award in *In Re Continental Securities Litigation* (N.D.Ill.). On March 2, 1993, the fee petitioners filed a "Motion for a Ruling on Class Counsel Fees" (hereinafter "Motion"). This motion addressed some of the matters I discussed in my opinion of February 18. On April 20, 1993, the court issued an order directing me to file a response to the petitioners' motion within 30 days. This is that response.

There is no disagreement about the basic proposition that the fee determination in this case should be made with reference to the relevant market rates for legal services. It has generally been thought that the lodestar approach will provide the court with a usable analog to how a lawyer would charge a paying client, because a lodestar determination is based on prevailing rates for the number of hours expended, *In Re Burlington Northern, Emp. Practices Lit.*, 810 F.2d 601, 604 (7th Cir.1986), with an exclusion of "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission," *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). In their motion, petitioners argue that by 1990, when I made the fee award, there was a "veritable avalanche of law from the Supreme Court of the United States, this circuit and nearly every other circuit that had considered the issue, rejecting lodestar methodology as outmoded and endorsing a percentage approach in common fund cases." Motion at 2. Their point, apparently, is that I erred when I did not use the percentage approach in 1990 ("he was duty bound to apply the legal principles controlling in 1990, *not* seven years earlier." *Ibid.*). One problem with this argument is that petitioners did not make it when they submitted their fee petition in 1989. In the

memorandum filed in support of the petition, they argued that the lodestar amount they were requesting was reasonable because it was a reasonable percentage of the settlement fund, Revised Memorandum of Class Plaintiffs' Counsel in Support of a Final Award of Attorneys' Fees and Reimbursement of Expenses ("Revised Memorandum"), at 21–25, but they did not suggest that I was free to ignore the 23 volumes of lodestar timesheets they submitted in support of the petition and simply grant them a percentage of the fund. Instead, they conceded that "[d]espite the recent criticism of the use of the lodestar approach in common fund cases, the Seventh Circuit has acknowledged that it has become 'the accepted method of determining fees in this circuit.' *Skelton,* 860 F.2d at 255 n. 4."[3] Revised Memorandum, at 25.

None of the cases cited by petitioners as constituting the "avalanche" of anti-lodestar authority, Motion, at 2–7, actually holds that a trial judge erred in using the lodestar. The percentage approach is gaining momentum currently, largely because of its relative simplicity. But as recently as 1991, a year after my fee award in this case, this court held that it was discretionary with the trial court whether to use the lodestar or percentage method in a common fund case. *Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974–75 (7th Cir.1991).

To some extent this discussion is a diversion, because the question is not what I should have done in 1990, but what I should do now in light of the mandate of this court issued in 1992. I explained in my opinion of February 18 why I believed the information available to me was insufficient to determine a percentage fee, realistic in terms of the market at the time counsel were retained, at this late stage of the case. One of my principal reservations about the percentage fee materials petitioners had furnished me after the remand was that those materials con-

---

2. *In the Matter of Continental Illinois Securities Litigation,* 985 F.2d 867 (7th Cir.1993).

3. Petitioners' reference was to *Skelton v. General Motors Corp.,* 860 F.2d 250 (7th Cir.1988), a common fund case. Interestingly, petitioners' present motion cites *Skelton* as indicating that

this Circuit has "all but put the lodestar method in its final resting place." Motion at 4. This is in connection with petitioners' argument that my view of the applicability of the lodestar method to this case is "Orwellian" and "revisionist." *Id.* at 2.

tained no hint that any of the law firms which seek the bulk of the fees in this case on a percentage basis has ever handled a commercial case on a percentage fee basis. *In Re Continental Illinois Securities Litigation*, 813 F.Supp. at 638. In their motion, petitioners offer no response whatever to this point. I observed that "it seems fair to conclude that these firms did not believe they had been parties to any fee contracts which would tend to support their present contention that percentage fees are, even in 1993, the way they do business." *Id.* My confidence in this conclusion is heightened by petitioners' silence.

Another reservation I had about the percentage fee materials is that almost all of them were of recent date. Petitioners do respond to this. They say that "[t]he problem with Judge Grady's observation is that it is impractical—if not impossible—to obtain in 1992 contingent fee agreements entered into by law firms a decade earlier, since law firms don't necessarily maintain files that long." Motion at 7. This statement is apparently intended to imply that petitioners were unsuccessful in efforts to locate relevant 1983 contract documents because none of the attorneys of whom they inquired had retained any copies. But petitioners do not expressly claim to have done this, and the word "necessarily" makes their statement meaningless. The question is not whether law firms "necessarily maintain files that long," but whether they do maintain them that long, necessity or not. I find it difficult to believe that any law firm would discard all copies of its fee contract in any major case, even though it might well discard most of the contents of the file itself after the case had been closed. But even in the unlikely event that the contract documents had all been thrown out, surely someone in the firm would be able to give an affidavit as to what the fee agreement was.

Petitioners also suggest that "there is no reason to believe that the marketplace for a contingent fee agreements in 1983 was any different than it is in 1993." Motion at 7. This begs the question; the production of contracts dating back to the early eighties may have been helpful in resolving the question. Petitioners' citation of *Bandura v. Orkin Exterminating Co., Inc.*, 865 F.2d 816 (7th Cir.1988), *id.*, is not helpful, because it was a personal injury case, not commercial litigation. The fact that personal injury cases have, for as long as anyone can remember, been handled on a percentage basis does not indicate anything about how commercial cases have been handled.

The time factor, however, is not one of the main problems I had with the petitioners' percentage fee materials. Aside from the fact that they contained no indication that any of the principal petitioning firms had ever handled a case on a percentage fee basis, the materials did not, for the most part, indicate anything about the nature of the cases to which they related and how the prospects of recovery had appeared at the time counsel had been retained. Moreover, most of the cases were not class actions, and some of the contracts provided for a "blend" of hourly rates and percentages. *In Re Continental Illinois Securities Litigation*, 813 F.Supp. at 637–38. Petitioners have made no response to these observations.

I think petitioners are less charitable toward lodestar methodology than their experience would warrant. It suits their present purposes to convince this court that 20 percent is the only sensible fee. But the inability of these petitioners to live with the lodestar is of quite recent origin. Specifically, it originated with this court's remand opinion of 1992. References in that opinion to a percentage approach, and the prospect of an automatic additional award of $4.5 million, if 20 percent were allowed, have caused petitioners to conclude that a regime under which they have prospered has suddenly become irrational and oppressive. The petitioning firms in this case have been, as I indicated in my February 18 opinion, *id.*, 813 F.Supp. at 638, among the most frequent lodestar petitioners in federal class actions.

Another major problem I have with applying a percentage in this particular case is that there is no basis for determining that, had a percentage been set originally, it would have been anything like the 20 percent petitioners are now claiming. I pointed out in my opinion of February 18, 1993, that the

competition among the various lawyers to represent the class in this case was intense. *Id.*, 813 F.Supp. at 638–39. Three of the four proposed class representatives sponsored by the competing lawyers had purchased their Continental stock *after* the failure of the Penn Square Bank and the attendant publicity about the deficiencies in Continental's loan portfolio. Their obvious purpose in making the purchases was to file class actions in which they and their attorneys could represent the class. *See In Re Continental Illinois Securities Litigation*, 750 F.Supp. 868, 873–74, 895 (N.D.Ill.1990). Of the petitioners in this case, only Lawrence Walner represented a named plaintiff who had purchased his stock before the Penn Square collapse. It was his client, Fred Steinlauf, whom I found to be the only suitable class representative. The other petitioners implored me to certify *their* clients as representatives of a class consisting almost entirely of persons who, unlike their clients, had purchased stock with no notice whatever of any problems in Continental's energy loan portfolio. (Petitioners' unsuccessful efforts to certify this inappropriate class for their own benefit constituted three categories of work for which they sought compensation in their fee petition. *See id.* at 882.) The only response petitioners have to this question of what percentage they would have been willing to work for is to cite various recent cases in which percentages to their liking have been sustained. Motion at 6, n. 4. The comparability of these cases to the situation that existed in this case in 1983 is not discernible from these citations. I seriously doubt that any of the cited cases involved the kind of frenetic jousting among attorneys that took place here. To believe that the present petitioners would have been unwilling to take this case on any basis less than 20 percent of the recovery would require me to disregard everything I remember about their efforts to win appointment as class counsel.

Again, however, I take it the question is not whether I would be sustained by this court if I were to adopt the approach urged by petitioners and award them an additional $4.5 million. Rather, it is whether this court's remand opinion *required* that I adopt the percentage approach. Petitioners have

argued in their mandamus petition, and again in their motion of March 2, that, in refusing to award a percentage—indeed, a specific percentage—I have defied both the letter and the spirit of this court's mandate. As was apparent to me from this court's order of January 21, 1993, petitioners established a formidable beachhead with this argument when they persuaded the court that my reaction to the remand order was to decide to reexamine every time entry in their petition. In my opinion of February 18, I explained why this was wrong and why petitioners' counsel knew it was wrong. I had made clear to him that I intended to base the redetermination of fees upon a relatively small sample of the time entries. *In Re Continental Illinois Securities Litigation*, 813 F.Supp. at 639. Petitioners' present motion deals with their misrepresentation in an offhanded manner, arguing that I am concerned about a distinction without a difference because "the essence of any sampling procedure, if properly done, is in fact a proxy for a review of *all* the time entries. That is what sampling is all about." Motion at 8–9. Had that been the idea petitioners sought to convey to this court in the mandamus petition, they could have put it that way, and the court would not have been misled into believing I intended to reexamine every time entry. The speciousness of petitioners' present argument is indicated by this court's own remand opinion, which referred to the *Evans* case as upholding "the district judge's use of a sampling procedure to determine the reasonableness of a fee request so that he wouldn't have to scrutinize every entry on the lawyer's billing sheets." *Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 570 (7th Cir.1992). Petitioners' specious attempt to rationalize what they told this court in their mandamus petition, involving nothing more than a play on words, serves only to highlight the original deception.

■ Turning to the merits of whether I have followed the mandate or not, I believe I have. To start with, I do not accept petitioners' interpretation of what the mandate was. It would have been simple enough for this court to remand the case with directions to

allow a percentage. The court did not do that, but instead, as I understood the opinion, left the methodology to me, with some specific suggestions as to techniques I should consider. As I have explained in my memorandum opinion of February 18, I understood that two of those techniques were percentage and sampling. A third possibility was the court's suggestion that I utilize a special master, *id.*, 962 F.2d at 573–74, a procedure that would be unnecessary if my task were only to award a percentage of the settlement fund.

I do not mean to indicate that when I read the remand opinion I consciously considered whether I was being directed to make the redetermination of fees by using a percentage method and no other. The idea that anyone could read the opinion that way never crossed my mind at the time. It is difficult for me to believe that the court itself could have any doubt about this question, but because I have been directed to respond to petitioners' motion, I will address what seems to be their basic contention that the remand opinion does in fact direct that they be awarded a percentage.

In their mandamus petition and in the motion of March 2, petitioners emphasize that the remand opinion did discuss the percentage approach. In the motion, they go a little farther and refer to my rejection of "the percentage fee approach which this Court said pointedly 'we have been at pains to stress....'" Motion at 2. If the remand opinion did, indeed, state that the court was "at pains to stress" the percentage approach, the opinion was more directory than I thought. But petitioners have quoted language the court was using in a different connection. What the court said was:

> The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible.

*Matter of Continental Illinois Securities Litigation*, 962 F.2d at 572.

Aside from there being no language in the remand opinion that directed a percentage approach, there are various statements of the court, in addition to those already mentioned in this response and in my memorandum opinion of February 18, which indicated that various approaches, including the lodestar itself, were open to me on remand. Discussing what it held to be my error in failing to award a risk multiplier, the court noted that in determining an appropriate multiplier on remand I "may or may not" wish to take account of the fact that the risk of loss varies over the life of a case.

> "*We are not trying to put him into a straitjacket* but are merely emphasizing that the failure to make any provision for risk of loss may result in systematic under-compensation of plaintiffs' counsel in a class action case, where as we have said the only fee that counsel can obtain is, in the nature of the case, a contingent one."

*Id.*, 962 F.2d at 569 (emphasis added).

Explaining its holding that I erred in refusing to allow interest, the court said

> Again, *we don't want to put the judge into a straitjacket. But if he uses current rates,* he must be sure to make some provision for the interval between the 'current' period and the date the lawyers actually received their money from the fund for the class.

*Id.*, 962 F.2d at 571 (emphasis added). Obviously, the reference to using "current rates" on remand has nothing to do with a percentage approach. Like the risk multiplier, it would be part of a lodestar calculation.

The court's discussion of percentage and sampling approaches was introduced by the following comments, specifically stating that I was not being ordered to use any particular method:

> The case must be remanded, however, for a redetermination of the fee due class counsel. This is a regrettable outcome in light of the time that the district judge has already devoted to this manner [4] and we shall therefore suggest (*not order*) an al-

4. "Manner" should probably read "matter."

ternative method of determination that might save time and expense for everyone.

*Id.,* 962 F.2d at 572 (emphasis added).

I have now dealt with what I understand to be two of the reasons petitioners have for saying that I have ignored the mandate of this court. One is that I have elected to review every time entry again. Assuming that this would violate the spirit of the mandate, as I think it would, I have never had any such intention. The other reason is petitioners' contention that the remand opinion directs a percentage approach, and I declined to use that approach. For the reasons I have indicated, I do not see how the remand opinion can reasonably be interpreted as directing the award of a percentage fee.

■ Another argument petitioners make is that I am not free to apply a sampling method to all of the hours contained in their fee petition. They contend that those categories of work in which I did not reduce the claimed hours in my original fee award cannot be the subject of any action on remand. They argue that "[s]omething is very wrong here. If class counsel's original fee submission was so inadequate, how could Judge Grady justify his 1990 decision?" Motion at 8. As I explained in my opinion of February 18, the answer to this question is that the format of· most of the time entries made evaluation impossible. I had attempted to prevent this very problem by entering an order early in the case, specifying timekeeping procedures that would make possible a determination of how much time had reasonably been expended. Petitioners simply ignored this order and confronted me with a mass of entries that no one could evaluate. My choices were to reject them all or allow them all, except for a small number of categories that related closely enough to my own work in the case that I thought I could make appropriate adjustments. *See* discussion, *In Re Continental Illinois Securities Litigation,* 813 F.Supp. at 635–36. The reason I thought I had only two choices was that the idea of sampling had not occurred to me. Intervening decisions of this Circuit have approved that method, and for the reasons I have previously explained, *id.* at 642, I be-

lieve it is appropriate to attempt a sampling now.

Petitioners suggest that the sampling method would require me to adhere to the kind of strict statistical procedures needed to validate a scientific study. Motion at 9, n. 7. If their view of the matter were adopted, I would have to retain a statistician. Nothing so rigorous or elaborate was involved in the sampling methods which have been upheld by this court. *Evans v. City of Evanston,* 941 F.2d 473, 476–77 (7th Cir.1991); *Harman v. Lyphomed, Inc.,* 945 F.2d 969, 975 (7th Cir.1991).

**CONCLUSION**

Obviously, I cannot tell the court what it intended when it remanded this case to me for a redetermination of fees. I have tried to explain in this response why I believed I was free to use my best judgment as to methodology. If I was correct in that understanding, it does not appear to me that petitioners have presented any persuasive argument as to why I should not make the redetermination by applying a sampling method to all time claimed in their petition.

DATED: May 14, 1993.